**Gratton Earl MOORE, Appellant,**

v.

**UNITED STATES of America.**

**No. 17931.**

United States Court of Appeals,
Third Circuit.

Argued Nov. 7, 1969.

Reargued May 26, 1970.

Decided Sept. 24, 1970.

John H. Lewis, Jr., Philadelphia, Pa., for appellant.

Joseph R. Ritchie, Jr., Asst. U. S. Atty., Philadelphia, Pa., for appellee.

John Hassett, Philadelphia, Pa., for amicus curiae, Defender Ass'n. of Philadelphia.

Stanley Van Ness, Public Defender, Trenton, N. J., for amicus curiae, N. J. Defender Ass'n.

Argued Nov. 7, 1969

Before MARIS, SEITZ and STAHL, Circuit Judges.

Reargued May 26, 1970

Before HASTIE, Chief Judge, and MARIS, FREEDMAN, SEITZ, VAN DUSEN, ALDISERT, ADAMS and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

FREEDMAN, Circuit Judge.

We ordered rehearing of this case before the Court en banc to review in the setting of representation by a defender agency the rule we adopted in United States ex rel. Mathis v. Rundle, 394 F.2d 748 (3 Cir. 1968), that an untimely appointment of counsel will create a presumption that the defendant was prejudiced and shift to the state the burden of showing the contrary.

On March 30, 1965, petitioner was found guilty by a jury and sentenced on four counts of federal bank robbery based on the holdup of a teller of the Abraham Lincoln Federal Savings and Loan Association in Philadelphia. He did not appeal from the judgment but three years later, while still imprisoned under an earlier conviction not here challenged, filed in the district court what he designated as a petition for a "writ of Error Coram Nobis," which the court treated as an application for post-conviction relief under 28 U.S.C. § 2255.[1] From his loosely drawn pro se papers it appears that he claims ineffective assistance of counsel, refusal of counsel to aid him in an appeal and failure of counsel to challenge the method of selection of the panel of prospective petit jurors.[2]

The district court, without holding an evidentiary hearing, denied the application. Petitioner appealed and argued in person before a panel of this Court. We later appointed counsel for him on the rehearing en banc. Because the case requires us to consider the practice of defender organizations, we permitted briefs to be filed as amici curiae by the Defender Association of Philadelphia, the Public Defender of New Jersey and the District Attorney of Philadelphia, who prosecutes most of the cases in which the Defender Association of Philadelphia furnishes representation to defendants. The Court is grateful to them and to petitioner's counsel who has ably represented him before us.

I

Petitioner was arraigned and pleaded not guilty on February 12, 1965. Leonard Packel, Esquire, appeared on his behalf as a member of the staff of the "Voluntary Defender's Office."[3]

■ Thereafter when the case was listed for trial on March 29, 1965,[4] Austin Hogan, Esquire, another member of the Voluntary Defender's Office, appeared for petitioner and requested a short postponement of the trial so that he might confer personally with him.[5] A

1. On the right to challenge the conviction while still incarcerated on the earlier charge, see Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968).

2. Petitioner sought to amend his application to include claims dealing with failure to submit points for charge and error in the court's instruction to the jury. These claims raise no real question, and we therefore do not discuss them here.

3. Petitioner agreed at the arraignment that he had "a full opportunity" to consult with Mr. Packel.

4. The government has moved before us that the proceedings of March 29, 1965, which were not transcribed until May 17, 1970 after the argument before our panel, be certified as part of the record. Petitioner opposes the motion on the ground that the transcript did not exist at the time the district court decided his petition. Since an attack under § 2255 in-

vokes a search of the record of the original proceedings (28 U.S.C. § 2255; Machibroda v. United States, 368 U.S. 487, 494, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); Del Piano v. United States, 362 F.2d 931 (3 Cir. 1966)) and since what occurred in the district court, even though at the time unrecorded, remains a fact in the proceedings, we shall take notice of it and grant the government's motion. See Rule 10(e) of the Federal Rules of Appellate Procedure; Rule 44(a) of the Federal Rules of Civil Procedure. See also, infra, n. 21.

5. In making his request Mr. Hogan said: "[W]e have done as much preparation for the Defender Association as is possible. * * * I would note, however * * * that this man has been confined in Lewisburg, where he is presently serving a previous sentence, and we have not had an opportunity to confer with him personally prior to to-

continuance was granted to the following day, March 30, 1965, when the trial was begun and concluded with Mr. Hogan conducting the defense.

Petitioner claims that since he did not meet Mr. Hogan until the day before the trial, the district court erred in refusing to invoke the rule of *Mathis* and hold that a presumption arose that he was prejudiced. This contention assumes that Mr. Hogan's appearance was the result of a separate appointment, unrelated to Mr. Packel's appearance at the arraignment a month and a half earlier. It is clear, however, that in one form or another the legal staff of the Defender Association of Philadelphia, headed by the Voluntary Defender, supplied representation to the petitioner both at the arraignment and at the trial.[6]

There is no room for doubt today that a legal aid society or a defender organization may properly supply representation to indigent defendants in criminal cases. Such institutions came into existence as volunteer agencies to represent indigent defendants [7] because no provision was made in either the federal or state systems for compensation of counsel appointed by the court. They have always been deemed to fall within the exception of charitable agencies from the traditional restrictions on corporate law practice or the supply of legal services by associations to their members,[8] which, in any case, have largely been eroded by Supreme Court decisions based on the constitutional rights of freedom of association and to petition for the redress of grievances.[9] The great social purposes involved in supplying services to indigents has always placed the activities of agencies like the Defender Association of Philadelphia on indubitably valid ground.[10] In any event, after Gide-

day." Mr. Hogan therefore asked that the case "be set back for a day or two in order that I might confer personally with the defendant."

6. We have found no instrument of appointment from which to determine the precise date of the appointment or the name in which the appointment ran, whether it was the Defender Association of Philadelphia, or the Voluntary Defender, who is the head of its staff of lawyers, or the "Voluntary Defender's Office," which the transcript gives as Mr. Packel's association.

7. See, e. g., Silverstein, Defense of the Poor in Criminal Cases in American State Courts (1965) (American Bar Foundation); Report of the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice (1963); Special Committee of the Association of the Bar of the State of New York and the National Legal Aid and Defender Association—Equal Justice for the Accused (1959).

8. Former Canon 35 of the Canons of Professional Ethics expressly exempts charitable organizations from the interdiction of the intervention of lay agencies between client and lawyer. It provides: "Charitable societies rendering aid to the indigent are not deemed such intermediaries." See Canon 2 of the present Code of Professional Responsibility and EC2–25 and nn. 56–61 (1970). See also Opinion of the Justices, 289 Mass. 607, 194 N.E. 313 (1935); Community Legal Services, Inc., 43 Pa.Dist. & Co.2d 51 (Phila.Co. 1967); cf. Application of Community Action for Legal Services Inc., 26 A.D.2d 354, 274 N.Y.S.2d 779 (1966); and see dissenting opinions of Harlan, J., in United Mineworkers of America v. Illinois State Bar Ass'n, 389 U.S. 217, 227 n. 3, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) and in N.A.A.C.P. v. Button, 371 U.S. 415, 457 n. 6, 83 S.Ct. 328, 9 L.Ed. 2d 405 (1963). See generally, Zimroth, Group Legal Services and the Constitution, 76 Yale L.J. 966 971–77 (1967).

9. See United Mineworkers of America v. Illinois State Bar Assn., 389 U.S. 217, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967); Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). See also Hackin v. Arizona, 389 U.S. 143, 143–152, 88 S.Ct. 325, 19 L.Ed.2d 347 (1967) (Douglas, J., dissenting).

10. In the socially useful business of liability insurance it has never been questioned that the company may contract in its policy for the right to furnish counsel to defend the insured. Zitomer v. Holdsworth, 200 F.Supp. 490 (E.D.Pa.1961); see also Hildebrand v. State Bar of California, 36 Cal.2d 504, 225 P.2d 508, 520–521 (1950) (Traynor, J., dissenting).

on v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), required the states to furnish counsel to indigents in serious crimes, Congress acted in the Criminal Justice Act of 1964 [11] and expressly authorized compensation for representation of indigents by attorneys "furnished by a bar association or a legal aid agency" or by private attorneys, or by a combination of both.[12]

 The recognition of the right of a defender organization to supply legal services to indigents makes it at once apparent that in such institutional representation the timeliness of the appointment must be measured by the time of the court's appointment of the institution and not by when individual staff members are assigned to perform their specialized duties. In *Mathis* there was no recognition of this distinction because it was blurred by the circumstances of the case.[13]

*Mathis* adopted the presumption rule of Fields v. Peyton, 375 F.2d 624 (4 Cir. 1967), out of the belief that it was desirable as a prophylactic measure to ensure prompt court appointment of counsel in the state courts. In fact, the cases in the Fourth Circuit [14] deal with court appointment of individual attorneys rather than defender organizations, and so there was no need to consider the problem of institutional representation in assessing the untimeliness of appointment. Moreover, the "presumption" recognized in *Fields* but rephrased the "inference" which had been recognized in Twiford v. Peyton, 372 F.2d 670 (4 Cir. 1967), and *Fields* acknowledged that the presumption or inference may be overcome not only by evidence offered by the state but also by the circumstances inherent in the case itself which may disclose that the representation was adequate despite the lateness of the appointment, as in Dawson v. Peyton, 359 F.2d 149 (4 Cir. 1966).

We are aware of no continuing practice of belatedly appointing counsel in the state courts in this Circuit, and in the large urban centers indigent defendants are largely represented by defender agencies.[15] There may often have been late appointments in times past, before the duty of the state to furnish counsel in criminal cases to indigent defendants became widely recognized. But at least since Gideon v. Wainwright, judges no longer designate counsel for a defendant from among the lawyers who happen to be present in the courtroom when the case is called for trial. In our Circuit as well as elsewhere state courts are mindful of the obligation to provide adequate representation to indigent defend-

---

11. 18 U.S.C. § 3006A. See also the earlier District of Columbia Legal Aid Act of 1960, P.L. 86–531, 74 Stat. 229.

12. In the Eastern District of Pennsylvania, the plan which the Act requires each district to adopt with the approval of the judicial council of the circuit took effect on August 20, 1965, after petitioner was tried. It provides for court appointment of an attorney from the Defender Association of Philadelphia and if this is not possible then an individual private attorney.

13. The record in *Mathis* indicates that at a hearing about one week before the trial a representative of the Voluntary Defender's Office appeared for the defendant and informed the court that the defendant was seeking to obtain private counsel. The court therefore withheld the appointment of counsel, but when the defendant failed to secure private counsel the Voluntary Defender was appointed on the eve of trial to represent him and the defendant met him for the first time only a few minutes before the trial began.

14. E. g., Fields v. Peyton, 375 F.2d 624 (4 Cir. 1967) ; Twiford v. Peyton, 372 F.2d 670 (4 Cir. 1967) ; Martin v. Virginia, 365 F.2d 549 (4 Cir. 1966) ; Turner v. Maryland, 318 F.2d 852 (4 Cir. 1963).

15. Indeed, the use of defender agencies on a statewide basis is now recognized by statute in some states. See, e. g., Public Defender Act of New Jersey, N.J.S. 2A:158A–1 et seq., N.J.S.A.; Public Defender Act of Pennsylvania (Act of December 2, 1968, P.L. —— (No. 358)), 16 Purdon's Pa.Stat.Annot. § 9960.1 et seq., providing for a public defender in every county in Pennsylvania except Philadelphia, where the Defender Association was already established.

ants in criminal cases.[16] There is, therefore, no need for a prophylactic rule, just as there is no need for the use of an artificial presumption.

What is a late appointment of counsel may in extreme circumstances seem evident, but the question necessarily involves a comparison of the time of the appointment with all the attendant circumstances, such as the gravity of the charge, the experience of appointed counsel, the extent of his knowledge and participation in similar cases, his opportunity for preparation and even what he may have been told by the defendant which may reduce the area of necessary preparation.[17] We believe it is preferable that the factual question whether the defendant received adequate assistance of counsel should not be enwrapped in the label of a presumption which itself floats adrift and first requires a preliminary decision on the uncertain question of what is a belated appointment without eliminating a full inquiry thereafter into the facts to determine whether the presumption has been overcome or rebutted.[18] If it be said that this will cast the burden of proof on the defendant, the answer is that it applies to the lawyer the presumption of the regularity of his conduct and that it is but just that one who claims his counsel had inadequately represented him should have the burden of proving the charge. A belated appointment of counsel would be strong evidence in a defendant's behalf, but a decision on the claim would still require an inquiry into the ability, experience and zeal with which counsel acted, both

at the trial and in preparation, to determine whether the charge was made out.

We therefore overrule *Mathis* to the extent it adopted the presumption doctrine. In doing so we do not intend to minimize the strong inference of prejudice from the failure to appoint counsel until the day of trial or very shortly prior thereto. Adequate preparation for trial often may be a more important element in the effective assistance of counsel to which a defendant is entitled than the forensic skill exhibited in the courtroom. The careful investigation of a case and the thoughtful analysis of the information it yields may disclose evidence of which even the defendant is unaware and may suggest issues and tactics at trial which would otherwise not emerge. Our abandonment of the *Mathis* presumption therefore does not alter our recognition of the objective it was meant to achieve, nor does it reflect any lessening of our concern that counsel be appointed far enough in advance of trial to permit adequate investigation and preparation.

The adequacy of the representation which petitioner received, which is the real issue in this case, can only be decided on an evaluation of the services rendered on his behalf. The record shows what is already a matter of common knowledge, that under the pressure of the vast numbers of cases which flow into defender offices in great urban centers their operations have become institutionalized, just as the same forces have generated similar results in the offices of prosecutors and even more

---

16. As a result of cases preceding *Fields*, the Attorney General of Virginia took steps to end the practice of late court appointment of counsel. See Martin v. Virginia, 365 F.2d 549, 554 (4 Cir. 1966); Fields v. Peyton, 375 F.2d 624, 627–628 (4 Cir. 1967).

17. E. g., in Turner v. Maryland, 318 F.2d 852 (4 Cir. 1963), court-appointed counsel did not consult his client until less than a half hour before the time set for the trial. But the facts showed that the defendant had participated in the crime and informed his counsel that his confession

to the police was true. The facts demonstrated that defendant had no information to communicate to the lawyer which could have been helpful and it was held that there was no inadequacy in the assistance of counsel.

18. Cf. Chambers v. Maroney, 399 U.S. 42, 54, 90 S.Ct. 1975, 1982, 26 L.Ed.2d 419 (1970): "Unquestionably, the courts should make every effort to effect early appointments of counsel. But we are not disposed to fashion a *per se* rule requiring reversal of every conviction following tardy appointment of counsel * * *."

strikingly in private law firms, now magnified in size and divided into specialized departments. The parties and amici curiae have sought to have us consider the details of the operations of defender offices, and the District Attorney of Philadelphia has referred us to the record in a case now pending before us on appeal[19] for a description of the operations of the Defender Association of Philadelphia.[20]

We do not consider these details, even if they might be judicially noticed,[21] for a judgment of their effect is a factual determination which must be made by a trial court and not first reached on appeal. It may well be that the specialization in the various stages of a criminal proceeding which is made possible by the vast volume of cases which comes to the Voluntary Defender's office promotes efficiency and provides expert service in every stage of a proceeding. These twin qualities of division of labor and specialization are the pillars of the large modern private law firm. On the other hand, in such an institutionalized system there are inherent the risks of a loss of the close confidential relationship between litigant and counsel and the subordination of an individual client's interest to the larger interest of the organization. These risks of course are greater in the case of indigents for whose clientele there is no compensating pressure of competition.[22]

■ Whether an indigent is represented by an individual or by an institution, he is entitled to legal services of the same level of competency as that generally afforded at the bar to fee-paying clients.[23] In both cases, therefore, the standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place.[24]

A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard.[25] Perfection is hardly attainable and certainly is not the general rule, especially in professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances. The artistry of the advocate is difficult to judge retrospectively because the elements influencing judgment usually can-

19. United States ex rel. Green v. Rundle, No. 18,418.

20. See also Comment, Client Service in a Defender Organization: The Philadelphia Experience, 117 U.Pa.L.Rev. 448 (1969).

21. As to noticing matters which are of record in other cases and even in other courts, see Pennsylvania v. Brown, 373 F.2d 771, 778 (3 Cir. 1967); Berkowitz v. Philadelphia Chewing Gum Corp., 303 F.2d 585, 587 (3 Cir. 1962); Chudoff v. McGranery, 179 F.2d 869, 871 (3 Cir. 1950); Zahn v. Transamerica Corp., 162 F.2d 36, 48 n. 20 (3 Cir. 1947). Accord, Granader v. Public Bank, 417 F.2d 75, 82–83 (6 Cir. 1969) (collecting cases). See generally, 9 Wigmore, Evidence § 2579 (3d ed. 1940); McCormick, Evidence § 327 (1954).

22. See United States ex rel. McCoy v. Rundle, 419 F.2d 118, 119–120 (3 Cir. 1969) (concurring opinion). See also Comment, Client Service in a Defender Organization: The Philadelphia Experience, 117 U.Pa.L.Rev. 448, 468–69 (1969); Skolnick, Social Control in the Adversary System, 11 Journal of Conflict Resolution, 52, 60–68 (1967), reprinted in Hall, Kamisar, LaFave & Israel, Modern Criminal Procedure, 104–9 (3d ed. 1969). And compare Dimock, The Public Defender: A Step Towards a Police State? 42 A.B.A.J. 219 (1956), with Harrington & Getty, The Public Defender: A Progressive Step Towards Justice, 42 A.B.A.J. 1139 (1956).

23. See United States ex rel. McCoy v. Rundle, 419 F.2d 118, 120 (3 Cir. 1970) (concurring opinion). And see generally Note, Effective Assistance of Counsel for the Indigent Defendant, 78 Harv.L.Rev. 1434 (1965): Note, The Indigent's Right to an Adequate Defense: Expert and Investigational Assistance in Criminal Proceedings, 55 Cornell L.Rev. 632 (1970).

24. See generally Restatement (2d), Torts § 299(a). See also infra, n. 27.

25. See McMann v. Richardson, 397 U.S. 759, 770–771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

not be captured on the record. The kaleidoscopic range of possibilities often seems limitless, and it is proverbial that the finest ideas emerge on the way back from the courthouse. The advocate's work, therefore, is not readily capable of later audit like a bookkeeper's. Of course, not all the activity of the advocate has this highly subjective quality. It is possible to examine the sufficiency of his preparation and the adequacy of his knowledge of the relevant law. Review may disclose failures at the trial. All these are matters which will inform the judgment on a retrospective inquiry whether counsel adequately performed his duty. But since what is required is normal and not exceptional representation, there is room for the realization that it would be difficult to find a case where even the ablest and most experienced trial lawyer would be completely satisfied after a searching re-examination of his conduct of a case.

Although these underlying principles have been expressed in our decisions, a distinction has at times been made between a claim of denial of due process of law because of the inadequacy of counsel and the general requirement of normal competency. It has been said that a claim that the defendant was denied due process of law requires a showing that counsel's representation was "so lacking in competency or good faith that it would become the duty of the trial judge or the prosecutor as officers of the state to observe and correct it. For in such a trial the defendant would be practically without representation and it would therefore be a farce and a mockery of justice." United States ex rel. Darcy v. Handy, 203 F. 2d 407, 427 (3 Cir. 1953).[26] While a distinction might be attempted between attacks on state convictions under the Fourteenth Amendment and those on federal convictions under the Sixth Amendment, we believe the increased recognition of the constitutional right to the assistance of counsel requires that the standard which prevails in federal cases under the Sixth Amendment should be applied equally to state convictions, to which the same guarantee is made applicable by the Fourteenth Amendment under Gideon v. Wainwright. The standard of normal competency[27] applies equally in each case. This standard also makes it clear that the ultimate issue is not whether a defendant was prejudiced by his counsel's act or omission, but whether counsel's performance was at the level of normal competency. That the client was prejudiced by a failure in performance is of course evidentiary on the issue.

26. See also United States ex rel. Carey v. Rundle, 409 F.2d 1210, 1213 (3 Cir. 1969), cert. denied 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970); United States v. Cariola, 323 F.2d 180, 185 (3 Cir. 1963); In Re Ernst's Petition, 294 F.2d 556, 558 (3 Cir. 1961). There is a conflict among other circuits as to whether effective counsel in these cases means counsel of normal competency or merely counsel not so incompetent as to render the trial a farce. See the collection of cases in Note, The Right to Counsel and the Neophyte Attorney, 24 Rutgers L.Rev. 379–87 (1970).

27. See cases and authorities cited in Restatement (2d) Torts, Appendix, § 299A, Reporter's Notes. See also Attorney's Liability for Negligence in Preparing or Conducting Litigation, 45 A.L.R.2d 5 (1956). Cf. Liability of Physician for Lack of Diligence in Attending Patient, 57 A.L.R.2d 379 (1958); Physicians and Surgeons: Standard of Skill and Care Required of Specialists, 59 A.L.R. 1072 (1929). See also McMann v. Richardson, 397 U.S. 759, 770–771, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763 (1970), where Mr. Justice White recently said: "In our view a defendant's plea of guilty based on reasonably competent advice is an intelligent plea not open to attack on the ground that counsel may have misjudged the admissibility of the defendant's confession. Whether a plea of guilty is unintelligent and therefore vulnerable when motivated by a confession erroneously thought admissible in evidence depends as an initial matter, not on whether a court would retrospectively consider counsel's advice to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases."

We turn now to the question whether the representation supplied to petitioner was equal to the normal requirement.

The question of identification was the fundamental issue in the case. It is one which is open to the most careful scrutiny.[28] Petitioner himself did not testify and called no witnesses, and the only evidence in the case was that presented by the government. The government's case on the issue of identification consisted of the positive in-court identification of petitioner by three eye-witnesses, Willis F. Treganowan, Sr., Edward J. O'Hanlon and William S. R. Ludlow. A fourth witness, William A. Koenig, testified that he was unable to identify the robber, and the fifth witness, Willis F. Treganowan, Jr., testified that petitioner resembled the robber but was unable to identify petitioner with certainty. Under these circumstances only a serious impeachment could be expected to neutralize petitioner's identification by the three witnesses.

O'Hanlon and Ludlow had testified that they had not seen petitioner in the interval between the robbery and the trial, and Treganowan, Sr., had given a similar impression. The prosecutor later stressed this in his summation. Petitioner, however, claims that he told his counsel that both O'Hanlon and Treganowan, Sr., had viewed him at a line-up in April 1964, prior to the trial and were unable to identify him as the robber, and that in July 1964, still prior to the trial, when he was arraigned on other robbery charges, Ludlow was brought to the courtroom by an F.B.I. agent who knew petitioner and who pointed him out to Ludlow. The latter claim is supported by the record fact that when Ludlow denied having seen petitioner at any time between the robbery and the trial, the prosecutor made a statement at side bar that the F.B.I. previously had brought Ludlow to the courtroom to identify petitioner.[29] But counsel's cross-examination of Ludlow on this significant admission was cursory and made no use of the impeachment element afforded by the prosecutor's statement at side bar. Treganowan, Sr., had already testified when the prosecutor made his side-bar statement, and when counsel sought to recall him for cross-examination regarding his prior opportunity for identification of petitioner it was discovered that the witness had left the courtroom. No further attempt was made to have him recalled for cross-examination.

The government urges that the failure of counsel to go more deeply into the question of the April 1964 line-up and the July 1964 identification was a tactical decision made out of fear of exposing the other bank robbery charges against petitioner. This claim, however, is undermined or at least shaken by the record indication that counsel was prepared to risk the disclosure that petitioner had been accused of another crime.[30] He sought to recall Treganowan, Sr., for cross-examination regarding prior opportunities for identification and he inquired of Ludlow whether he had seen petitioner or spoken to the police about

28. The Supreme Court has said that the "vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." United States v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149 (1967).

29. The Supreme Court has taken note that "[T]he practice of showing suspects singly to persons for the purpose of identification * * * has been widely condemned." Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967). See also United States v. Wade,

388 U.S. 218, 228–232, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

30. There is serious doubt that such evidence would have been admissible since petitioner did not testify and did not put his character in issue. See generally Michelson v. United States, 335 U.S. 469, 475–476, 69 S.Ct. 213, 93 L.Ed. 168 (1948); Boyd v. United States, 142 U.S. 450, 12 S.Ct. 292, 35 L.Ed. 1077 (1892); Odom v. United States, 377 F.2d 853, 859–860 (5 Cir. 1967); United States v. Clarke, 343 F.2d 90, 91–92 (3 Cir. 1965); 1 Wigmore, Evidence § 57 and §§ 193 et seq. (3d ed. 1940).

him at any time between the robbery and the trial.

Moreover, there is nothing in the record indicating that any effort had been made to track down petitioner's claim that he had been subjected to a line-up or to interview the government's witnesses in advance of the trial on petitioner's claim that they had been unable in two instances to identify him at the line-up and in the third instance had identified him only after the F.B.I. had pointed him out at an arraignment on other charges.

In addition, there is no explanation for counsel's failure to call or to comment on the government's failure to call the two other mentioned eye-witnesses, Betty Wycowski, a clerk at the savings and loan association, and an unidentified customer eye-witness. Petitioner claims that he informed his counsel that a female employee of the savings and loan association had refused to identify him at the April 1964 line-up as the robber. No explanation has been given for the failure to call Miss Wycowski as a witness beyond the statement that she had "entered the religious life." In a matter of such importance to petitioner's rights we know of no reason why his counsel should not have called her or at least have commented on the government's failure to call her. Surely her religious commitment would not have forbidden her to give testimony to shield a man from a serious criminal charge if it had been mistakenly made against him.

The district judge dismissed without an evidentiary hearing petitioner's claim of inadequacy of counsel. From his personal recollection of the trial he was of the opinion that Mr. Hogan had performed his services very well in what he described as a "short, conceptually simple trial."[31]

We have no doubt that counsel acted in an effective manner as far as the trial judge was able to observe his conduct. But representation involves more than the courtroom conduct of the advocate. The exercise of the utmost skill during the trial is not enough if counsel has neglected the necessary investigation[32] and preparation of the case or failed to interview essential witnesses or to arrange for their attendance. Such omissions, of course, will rarely be visible on the surface of the trial, and to that extent the impression of a trial judge regarding the skill and ability of counsel will be incomplete.

In the light of petitioner's claim of inadequacy of the preparation for trial as well as of counsel's performance at the trial itself and the seeming confirmation of some of these claims which the record presents, we believe it is not possible to say, as § 2255 requires, that the files conclusively demonstrate that the claims are so unfounded that they may be rejected without an evidentiary hearing.[33]

The order of the district court dismissing the petition, therefore, must be reversed and the case remanded for an

---

31. The district judge found his recollection reinforced by his observation to petitioner at the time of sentencing, two months after the trial: "Mr. Hogan, who represented you in the trial in which you were found guilty by the jury, had really done a remarkably fine job, even though the results were not to your liking, and I am quite able to understand how you felt about that."

32. The Criminal Justice Act recognizes this evident fact in providing: "Representation under each plan shall include counsel and investigative, expert, and other services necessary to an adequate defense." (18 U.S.C. § 3006A(a)).

33. Section 2255 requires an evidentiary hearing to determine the facts "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." See Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963); Machibroda v. United States, 368 U.S. 487, 494, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962); and see generally 2 Wright, Federal Practice and Procedure, § 599 (1969). Similarly in habeas corpus, see Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

evidentiary hearing on the adequacy of the legal services supplied to petitioner by the Defender Association.

## II

Since an evidentiary hearing must be held the district court will have the opportunity to obtain at that time a fuller record on petitioner's claim that his counsel refused to aid him in taking an appeal from his conviction.

## III

Petitioner also charges that his counsel failed to make a claim of bias in the exclusion of Negroes from the jury which tried him. His counsel's response is that he refused to present the claim because there was no basis for it. The district court held the claim, so far as it constituted a claim independent of a claim of inadequacy of counsel, was foreclosed because it was not raised when the jury was empanelled.

■■ We see no reason why a challenge to the composition of a petit jury panel should not be raised before the jury is sworn. It is a claim which should be made before the trial begins on the merits. It is all the more untimely when, as here, it is first raised long after the trial has been concluded, the verdict of guilty rendered and the jury discharged.

We hold, therefore, that in the present circumstances the objection was raised too late and is foreclosed.[34]

## IV

■ A final point remains. Petitioner was sentenced on four counts for violation of various paragraphs of 18 U.S.C. § 2113. Since all the charges arose out of a single bank robbery, petitioner claims and the government concedes that the multiple sentences constituted an impermissible "pyramiding" of sentences in violation of the principle of Prince v. United States, 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957),[35] even though all the sentences were suspended except the sentence under count 1 to 10 years imprisonment. We agree.

The order of the district court will be reversed and the case remanded with direction to vacate the sentences on all counts other than count 1 and to hold an evidentiary hearing on petitioner's claims, in accordance with the views expressed in this Opinion.

VAN DUSEN, Circuit Judge (concurring):

I concur in the court's opinion except to the extent that the language used on page 15 purports to hold, by way of obiter dictum, that the standard required of the states by the Fourteenth Amendment

34. See Shotwell Manufacturing Company v. United States, 371 U.S. 341, 362–363, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963); Frazier v. United States, 335 U.S. 497, 530, 69 S.Ct. 201, 93 L.Ed. 187 (1948); Atlas Roofing Manufacturing Co., Inc. v. Parnell, 409 F.2d 1191, 1194–1195 (5 Cir. 1969) and cases there cited. Rule 12(b) (2) of the Federal Rules of Criminal Procedure providing that objections to the grand jury array are waived unless raised by motion before trial has been treated as equally applicable to petit juries in Shotwell Manufacturing Company v. United States, supra. See also Pinkney v. United States, 380 F.2d 882, 887 (5 Cir. 1967), cert. denied 390 U.S. 908, 88 S.Ct. 831, 19 L.Ed.2d 876 (1968); United States v. Hoffa, 349 F.2d 20, 49 (6 Cir. 1965), aff'd 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); contra: Fernandez v. Meier, 408 F.2d 974 (9 Cir. 1969).

The Jury Selection and Service Act of 1968, as amended (28 U.S.C. §§ 1861–1871) adopted since petitioner's trial, provides for a motion to dismiss the indictment or stay of the proceedings on the ground of substantial failure to comply with the statute in selecting the grand or petit jury, but requires that the objection be made [B]efore the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier. * * *."

35. See also Heflin v. United States, 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959); United States v. Welty, 426 F.2d 615 (3 Cir. 1970); United States v. Chester, 407 F.2d 53, 55–56 (3 Cir.), cert. denied 394 U.S. 1020, 89 S.Ct. 1642, 23 L.Ed.2d 45 (1969).

in furnishing counsel to indigent defendants in criminal cases is contained in the authorities cited in footnote 27, as opposed to that stated in all the federal cases dealing with this question such as McMann v. Richardson, 397 U.S. 759, 770–772, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); Chambers v. Maroney, 399 U.S. 42, 53–54, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the cases cited in ABA Standards Relating to Providing Defense Services, page 2, and our own decision in United States ex rel. Darcy v. Handy, 203 F.2d 407, 427 (3rd Cir. 1953), where this court emphasized the affirmative requirements of "complete loyalty" and efforts "in good faith to the best of [counsel's] ability." See, also, ABA Standards Relating to Providing Defense Services, Principles 1.1, 1.4, 2.2, 5.1, 5.2, 5.3, App. B, p. 68 ("counsel whose experience is commensurate with the seriousness of the charge"), p. 69 (par. 4, including "experienced, competent and zealous counsel"), App. C, pars. 1 and 7 (1967). See, also, ABA Standards Relating to the Prosecution Function and the Defense Function: The Defense Function, Principles 1.1, 1.2, 1.6, 3.1, 3.2, 3.5, 3.6, 3.7, 3.8, 3.9, 4.1, 4.4, 5.1, 5.2, and Parts VI, VII, and VIII (1970); ABA Standards Relating to Criminal Appeals, Principles 2.2, 3.2 (1969). Since the distinguished draftsmen of the ABA Standards Relating to Providing Defense Services concluded that (page 1):

> "No controlling authority, either statute or decision, yet directly requires that the advocates must possess any particular standard of skill, but it is implicit that representation should be adequate to the need. No one can guarantee that the particular lawyer representing one side will be professionally the equal of the other; what is important is that the *system* for providing counsel and facilities for the defense be as good as the system which society provides for the prosecution."

judicial restraint indicates that we should not articulate a standard in this area of the Fourteenth Amendment inasmuch as it is not involved in this federal criminal appeal and the Bar is taking vigorous steps to comply with the Fourteenth Amendment's commands in this area. In carrying out the principles of the ABA Standards Relating to Defense Services, developments may occur which will enable a more effective standard to be formulated than that provided by the state decisions relied on in footnote 27.

MARIS, Circuit Judge, joins in this opinion.