**Emmett HARRIS, Petitioner,**

v.

**Harry W. TOWERS, Acting Director of the Division of Adult Corrections, and the State of Delaware, Respondent.**

No. 188.

United States District Court,
D. Delaware.

March 20, 1974.

**498**

L. Vincent Ramunno, Wilmington, Del., for petitioner.

W. Laird Stabler, Jr., Atty. Gen., for respondent.

## OPINION

STAPLETON, District Judge:

This is a habeas corpus proceeding. On January 19, 1971, Emmett Harris was convicted by a jury in Georgetown, Delaware, of having raped a thirteen year old girl. The conviction was affirmed by the Supreme Court of Delaware. *Harris v. State*, 293 A.2d 291 (1972). Post-conviction relief was then sought in the Superior Court on the ground that petitioner had been deprived of the effective assistance of counsel in violation of his rights under the Sixth Amendment. After a hearing, relief was denied. This decision was affirmed by the State Supreme Court. *Harris v. State*, 305 A.2d 318 (1973).

Petitioner here renews his attacks on his conviction, asserting, among other things, that he was denied the right to effective assistance of counsel. On the basis of the evidence presented at petitioner's trial, in the post-conviction hearing in the trial court, and during the evidentiary hearing in this proceeding, this Court finds the following facts.[1]

Shortly before 5:00 P.M. on Sunday, July 5, 1970, the Delaware State Police received a report that a young girl had been raped in a corn field near her home outside Seaford, Delaware. The police arrived at the home of her parents at approximately 5:00 P.M. and after talking briefly with the girl advised that she be taken to the hospital for examination. At the hospital she was examined by Dr. Daniel A. Alvarez, Jr. Counsel have agreed before this Court that the alleged victim of the rape was of oriental extraction. She was of fair complexion, however, and counsel disagreed as to whether her eastern background was readily apparent from personal observation.

Petitioner, a black man, was arrested on the evening of July 5, 1970 and was committed, in default of bail, to the Sussex Correctional Institution. On September 7, 1970 petitioner wrote to the office of the Public Defender requesting representation. He received no response until the early part of October 1970, when Paul Reed, Esquire, a member of the Public Defender's office, visited him at the Sussex Correctional Institution.

Reed remained about twenty minutes. They discussed the facts of the case and counsel took notes. The notes indicated that the crucial issue in the case would be whether there had been consent. The next day Reed represented petitioner at his arraignment and a plea of not guilty was entered. On October 13, 1970 petitioner was transferred from the Sussex Correctional Institution to the New Castle Correctional Institution, some one

---

1. These findings are based either upon uncontradicted evidence contained in the record of the prior proceedings or upon evidence produced before this Court.

hundred miles away. Petitioner was transferred back to the Sussex Correctional Institution on January 13, 1971. During the period from October 13, 1970 to January 18, 1971, petitioner wrote a letter to Reed and had a social worker call Reed for him on two or three occasions. The letter was not answered and Reed's secretary indicated he was not available to take the calls. There was no other relevant communication between the two during this period.[2]

Petitioner's case was scheduled for the selection of a jury on January 18, 1971 and for trial on January 19, 1971. At some point prior to the commencement of trial, Reed talked to a "cooperative" prosecutor about the state's case, read the police and medical reports, and spoke with Dr. Alvarez. From Dr. Alvarez and his report, Reed learned (1) that the examination of the girl's hymen left prior intercourse as a physical possibility, (2) that the examination, conducted within an hour or so after the alleged assault, revealed sperm in the vagina but that all of these sperm were "non-motile" and (3) that this fact indicated that these sperm either had been in the vagina for a substantial number of hours prior to the examination or had been placed there by a sterile man. Reed also knew that his client was thirty-two years of age and had four children.

Reed had this information for a substantial period before trial—in his words "probably a week or month" before trial. He did not, however, make any effort to secure any further information bearing upon the girl's reputation or personal life or upon his client's sterility or non-sterility. Nor was any effort made by Reed to interview the prosecutrix or any other potential witness for the state other than Dr. Alvarez.

Reed and petitioner met in the courtroom on the morning of January 18,

1971. Petitioner gave Reed a list of character witnesses whom Reed later interviewed by telephone on the morning of trial. During their conference before the jury selection, petitioner advised Reed for the first time that an attorney, Samuel Lewis, had visited him while he was at the New Castle Institution and that some effort had been made by his family to engage Mr. Lewis' services for his case. Reed called Lewis and was advised by him that he had not been retained. Lewis got the "impression" that Reed was not prepared to go to trial and suggested to Reed that he seek a continuance. Reed indicated in response that he had to go to trial as currently scheduled.[3]

The jury selection commenced at 11:00 A.M. and was concluded at 11:20 A.M. Reed was familiar with the jury panel from other cases he had tried during their tenure and had jury cards giving background on each of the individual jurors. The court asked the members of the jury panel whether anyone had communicated with them in any way concerning the case and whether they had had any professional contact with the attorneys involved. Reed made no special requests for voir dire questions. The defense utilized its six peremptory challenges.

The trial commenced at 10:05 A.M. on January 19, 1971. The prosecutor made an opening statement. Defense counsel did not.

The prosecutrix was called as the state's first witness. She testified that she had turned fourteen on October 17, 1970 and was presently in the ninth grade. On Sunday afternoon, July 5, 1970 she had gone out by herself to pick blackberries along a fence separating a roadway and a corn field near her home. She stated that while she was picking berries, a negro male drove by several times in a two-tone green Cadillac. On one occasion he stopped and attempted

---

2. Reed testified that he had seen petitioner in the Sussex prison on more than one occasion prior to trial, but indicated that October 5th was the only occasion upon which he had discussed the facts with him.

3. The case had been continued once before.

to engage her in conversation. At approximately 4:10 P.M., according to her testimony, she turned and was surprised to find the man immediately behind her. She had her hand on a barbed wire fence and cut her finger slightly when she was seized by the man. He dragged her several rows back in the corn field, according to her testimony, and, after a struggle, raped her. She testified that, after this incident, she ran away in the general direction of her home, came to a lake, removed her shoes, jumped into the lake, and was shortly removed from the lake by two men in rowboats. One of them took her home. Within 15 to 30 minutes she was taken to the hospital for examination.

With respect to the rape itself, the girl testified that the defendant had pinned her to the ground diagonally across a row of corn. He was "on top of her" at one point with his elbow pinning one arm, his hand across her mouth, and his other hand holding her other arm. Her pants were pulled down but not removed; during the rape her feet were together but her legs apart. Penetration, she testified, lasted for five to ten minutes. She continued to struggle.

The prosecutrix further testified that she had not previously had sexual intercourse and that her knowledge of sexual matters came solely from classes in school.

The remainder of the state's case consisted of the testimony of the two men in the rowboat, the testimony of Dr. Alvarez, the testimony of several policemen concerning the condition of the alleged scene of the crime, the testimony of a woman who had seen petitioner shortly after the time of the alleged offense with dirt on his pants, and a written statement given by petitioner on the evening of July 5, 1970. The two men in the rowboats testified that the girl was hysterical when she was taken from the lake. One of them testified that he had seen the Cadillac pass on the road a number of times prior to the alleged crime.

Dr. Alvarez testified that he had made a general examination of the girl's body followed by a vaginal examination. The general examination revealed a laceration of the small finger on the left hand, sand in her pubic hair and superficial scratches "over the inner aspect of the right thigh," adjacent to the pubic area. The vaginal examination revealed some sand in the introitus and mucus close to the cervix inside the vagina. The mucus was examined by Dr. Alvarez in the laboratory. There were sperm present but, as expressed in the doctor's report, they were "non-motile, all of them." The doctor testified that this indicated one of two things:

The spermatazoa that were there are dead or it could be also possible that the person that that spermatazoa belongs to is a person that is sterile.

No testimony was elicited from Dr. Alvarez concerning the life span of sperm.

The doctor also testified that his examination revealed the presence of "an elastic hymen with a small laceration on the top." The laceration was "an old one"; it was a "healed laceration." The doctor indicated that it could not be determined whether or not the laceration was the result of sexual intercourse.

Trooper Short testified that petitioner, after being arrested at 9:00 P.M., had been given appropriate warnings concerning his constitutional rights both at the place of arrest and subsequently at Troop 5 where he was questioned. At 9:50 P.M. a statement was taken. In his statement petitioner acknowledged having had intercourse with the girl. The statement further related that he had joined the girl with her consent to help pick blackberries, and that they had engaged in conversation. In the words of petitioner's statement, "one word led to another and I don't really know what happened after that, until I realized what I was doing. After realizing what was taking place, I left." When asked whether he remembered how he and the

girl got from the blackberry bushes into the corn field, petitioner responded "No, not really. I guess I just lost myself and I don't know what really happened then."

The state rested its case at 12:57 P.M. After a luncheon recess until 2:00 P.M., the defense presented its case. The defense consisted of petitioner's own testimony and the testimony of three character witnesses (a farmer and businessman, petitioner's minister, and petitioner's mother). Petitioner testified, in response to his counsel's questioning, that on the day in question he was 32 years old. He indicated he stopped initially because he thought the girl had spoken to him. He asked her how the blackberries were and then engaged in conversation. Subsequently he parked his car down the road and returned to talk and pick berries with her. According to petitioner, after other conversation about family and other possible prior meetings, they "got on the subject of sex." She indicated, according to petitioner, that she had had sexual intercourse before. Thereafter, petitioner testified, "I got to talking to her and the next thing I noticed her and I was embraced more or less." After going back into the corn field they engaged in consensual intercourse. According to petitioner there was no struggle and the prosecutrix removed one leg from her pants. Petitioner said he left as the girl was going back to get her blackberries and go home.

The three character witnesses testified that the defendant's reputation in the community for truth and veracity and for maintaining peace and good order was good.

The closing argument of the defense occupies five and a half pages of transcript. Counsel challenged the girl's account of the rape and preceding struggle as being physical impossibilities. He noted that the girl's hymen was such that she could have had previous intercourse and urged that the defendant's statement was not inconsistent with consensual intercourse between the two. He emphasized what he maintained to be an inconsistency between the girl's account of a violent struggle and rape in a corn field and the fact that she had no scratches, bruises or abrasions other than the superficial scratch testified to by Dr. Alvarez. On the issue of whether, in the event of a finding of guilt, there should be a recommendation of mercy,[4] counsel confined himself to the comment "that under the circumstances, with the damages no more than they are here, this would be a proper case for a recommendation of mercy."

The jury retired to deliberate at 3:15 P.M. Petitioner was convicted without a recommendation of mercy and sentenced to life imprisonment.[5]

### A. Petitioner's Charges and The Trial Court's Ruling

During the post-conviction proceedings in the trial court, petitioner and new counsel challenged the adequacy of Mr. Reed's representation on the following grounds: (1) failure, in general, to adequately prepare for trial, (2) failure to investigate the reputation of the prosecutrix, (3) failure to pursue the fact of the presence of dead sperm and its implication, (4) failure to request any voir dire of the jurors, especially as to racial bias and prejudice, (5) failure to make

---

4. Under the Delaware law at the time, in the absence of a jury recommendation of mercy, the mandatory sentence upon conviction for rape was life imprisonment. If the jury recommended mercy, the trial judge could impose a sentence for any period not less than three years instead of life imprisonment.

5. The jury reached a unanimous decision on the guilt of the defendant, but was unable to reach agreement on the mercy issue. Upon ascertaining that the jury had separately considered the issue of guilt and were deadlocked regarding mercy, the judge discharged the jury at 4:48 P.M. The court thereafter ruled that the result of the jury's deliberations was a verdict of guilty without a recommendation of mercy. The petitioner alleges that this ruling deprived him of due process of law.

an opening statement at any time during trial, (6) failure to make objections at trial and (7) failure to submit any requests for jury instructions.

Following the hearing, the trial judge made no specific findings of fact with respect to these challenges. He did, however, state the following conclusions at the close of the hearing:

There was conflicting testimony in the case as to one issue, and to one issue only, and that issue was consent. Mr. Reed had full knowledge of the defendant's position with respect to consent, possibly solicitation, and that was the issue.

As far as witnesses were concerned, there were no witnesses Mr. Reed could contact in preparing adequately for the defense of the case. His only witnesses, and the only witnesses furnished to him by Mr. Harris, were character witnesses.

I heard the trial of this case and I was satisfied before the jury ever returned a verdict that this man was guilty of the offense as charged beyond any reasonable doubt. I am still so satisfied.

I have read and reread the transcript of the proceedings before me during the trial of this case, and applying the Maryland Rule as approved by the Supreme Court of this State, and which is to be found in the case of *Green vs. Warden, Maryland House of Correction*, 3 Maryland Appeals 266, 238 Atlantic 2nd, 920, 922 (1968), I find very clearly that there was no incompetency or any negligence by Mr. Reed in the performance of his duty as the attorney for the defendant. Quite to the contrary, this Court feels that Mr. Reed did more than an adequate job in defending the petitioner as the testimony clearly shows on the record.

The Delaware Supreme Court, in affirming the denial of post-conviction relief, quoted the two preceding paragraphs and concluded that it could not say that the trial judge's findings were "clearly wrong" or that "the doing of justice . . . [required] their overturn."

### B. *The Applicable Standard Under Federal Law*

■ Prior to *Moore v. United States*, 432 F.2d 730 (3rd Cir. 1970), the test in this circuit for determining adequacy of counsel was not altogether clear. Some cases suggested that effective counsel meant counsel of normal competency; other indicated that it meant counsel not so incompetent as to render the trial a farce. In *Moore* the court ruled that "the standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place." 432 F.2d at 736.

In announcing this standard, the court in *Moore* referred to Section 299A of the Restatement of Torts. That section provides:

Unless he represents that he had greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

As the court in *Moore* observed, the ultimate issue "is not whether defendant was prejudiced by his counsel's act or omission, but whether counsel's performance was at the level of normal competency." Elaborating on this point, the court stated:

A retrospective examination of a lawyer's representation to determine whether it was free from any error would exact a higher measure of competency than the prevailing standard. Perfection is hardly attainable and certainly is not the general rule, especially in professional work where intuitive judgments and spontaneous decisions are often required in varying circumstances. . . . Of course, not all the activity of the advocate has

this highly subjective quality. It is possible to examine the sufficiency of his preparation and the adequacy of his knowledge of the relevant law. Review may disclose failures at the trial. All these are matters which will inform the judgment on a retrospective inquiry whether counsel adequately performed his duty. But since what is required is normal and not exceptional representation, there is room for the realization that it would be difficult to find a case where even the ablest and most experienced trial lawyer would be completely satisfied after a searching re-examination of his conduct of a case.

### C. Petitioner's Representation

 Taken alone, none of the petitioner's specific criticisms of his counsel's trial performance would warrant a finding that his Sixth Amendment right to the effective assistance of counsel was violated. Reed was an experienced trial lawyer, and each of the alleged deficiencies in trial performance, viewed by itself, could possibly have been the product of an exercise of his professional judgment which should not be second-guessed.

Petitioner maintains, however, that all of the evidence taken together demonstrates that Reed was unable to give petitioner's case the amount of time and thought which would have been devoted to it by a defense attorney in a rape case exercising the skill, knowledge and care which normally prevailed among members of the Delaware Bar in 1971.[6] Thus, it is urged, the significance of counsel's failure to request voir dire questions, his failure to make an opening statement, and the brevity of his treatment of the mercy issue can only be grasped when viewed in the light of his very limited pretrial contact with peti-

tioner and his witnesses and his failure to develop and present what appeared to be highly relevant evidence.

This Court agreed with petitioner that the matter could only be decided in the overall context of counsel's pretrial and trial performance, and, for that reason, decided to hold an evidentiary hearing. The facts concerning the "dead sperm" issue and counsel's failure to pursue its implications were not fully developed in the post-conviction relief hearing in the trial court. In particular, it was unclear from the testimony there given what information defense counsel possessed prior to trial and what reason, if any, he had for not pursuing the dead sperm issue in the investigative and trial stages of the proceeding. Having heard Mr. Reed's account of his knowledge and trial strategy, this Court agrees with petitioner that the facts concerning this issue are of crucial importance in evaluating the overall performance of defense counsel.

Counsel was confronted with a situation in which his client faced a possible life sentence. His client admitted intercourse; his defense was consent. Credibility was crucial. The facts of the case —the respective ages of the principals, the difference in their race, and the absence of any evidence of prior contact between the two—made it hazardous to present the jury solely with their own conflicting accounts. Proof of prior intercourse would seriously impeach the credibility of the prosecutrix. More importantly, however, petitioner's story of consensual intercourse would be far easier to sell if supported by evidence of prior promiscuity on the part of the prosecutrix. Consent by a young virgin after a brief conversation in a field is one thing. Consent in the same context by a girl who had recently experimented with sexual intercourse is quite another.

As previously noted, counsel had learned a number of days prior to trial,

---

6. Delaware is a small state both in terms of area and population. It was customary, at that time as now, for a lawyer to try cases in all three counties regardless of the county in which his office was located. Nothing in this record provides a basis for distinguishing the customary practices in Sussex County from those in the remainder of the state and neither side suggests that any such distinction should be made.

(1) that the doctor's examination of the hymen left prior intercourse as a physical possibility, (2) that the examination, conducted within an hour or so after the alleged assault, revealed sperm which were all non-motile and (3) that this fact indicated that the sperm extracted from the prosecutrix had either been in the vagina for a substantial number of hours or had been placed there by a sterile man. Counsel also concededly knew that petitioner was 32 years old and had four children.

It should be stressed at this point that the foregoing information had actually been communicated to counsel prior to trial.[7] He frankly testified before this Court that, in his view, the sperm "probably would have been alive" if they had been [placed in the vagina] in the last hour or two." He acknowledged that the facts known to him about the sperm indicated "that she was, in all probability, not a virgin."

Despite this knowledge, defense counsel made no effort whatever before trial to secure information about the reputation of the prosecutrix. At trial he solicited no testimony from Dr. Alvarez concerning the significance of the non-motile sperm other than that this meant the sperm were either dead or were from a sterile man. No opinion was solicited regarding the life span of sperm and no evidence was offered to indicate that petitioner was non-sterile.[8]

It seems indisputable to this Court that Dr. Alvarez's finding of non-motile sperm should have prompted some investigation of the prosecutrix. Moreover, even if further investigation proved unfruitful, it seems apparent that the available evidence regarding the sperm provided strong and compelling support for the inference that the prosecutrix, contrary to her sworn testimony, had engaged in sexual intercourse prior to the alleged rape. In addition to discrediting the testimony of the prosecutrix, this inference would have made the defense story of consensual intercourse far more credible.[9]

To say that highly relevant evidence in support of defendant's version of the facts was available but unused at trial does not, however, end the inquiry. There are frequent occasions during trials of criminal cases when an attorney decides not to offer helpful evidence because of a concern about jury reaction. Here, of necessity, the defense attacked the integrity and virtue of a young girl. Still, a defense attorney, with the mercy issue in mind, might conceivably have made the judgment that evidence of prior sexual intercourse by a thirteen year old girl would alienate the jury. Clearly it would be a mistake for the law not to leave room for judgments of this kind based on "jury feel."

7. At the hearing before this Court the parties presented expert testimony concerning the life span and characteristics of sperm. While the experts indicated that many factors may affect the life span, it is fair to say that all agreed that it would be highly unusual to find a sample in which all sperm were non-motile if the sperm had been placed in the vagina by a non-sterile male only an hour or two before. I do not, however, consider this "evidence after the fact" to be relevant. Certainly a lawyer does not have to know the life span of a sperm in order to be competent. What is important is that petitioner's lawyer had actually received information prior to trial which was highly relevant to petitioner's case.

8. It is, of course, possible that petitioner became sterile after the conception of his four children, but the facts indicated a high probability that he was virile and that the matter should be further pursued.

9. I do not suggest, of course, that the available and unused evidence would have demonstrated the defendant's innocence and left the prosecution without any room for argument before the jury. The state might, for example, have argued, as suggested before this Court, that the dead sperm evidence was inconsistent with defendant's concession that he had had consensual relations with the girl. This would be fair argument but nothing in this record indicates that the inference of inconsistency would be a necessary one. There is no testimony regarding ejaculation and no medical opinion that defendant's sperm could not have been present without being picked up in the sample.

In this case, however, I am satisfied that no such judgment was exercised. During the two post-conviction hearings, Reed offered an explanation of how development of the sperm issue might have been hazardous to his client. I think it clear, however, that this explanation, was at best, an after-the-fact-reconstruction.[10] More significant for present purposes was the following colloquy between the Court and Mr. Reed near the close of his testimony in the habeas corpus hearing:

THE COURT: Do you recall whether you considered and rejected the idea of developing the immotile sperm point or not? Or can you reconstruct your thought process at the time?

THE WITNESS: No, I don't. At this time I don't know any reason why I would have.

THE COURT: Beg your pardon?

THE WITNESS: Even today, I don't know why I would have where he had admitted there had been relations with her.

THE COURT: Mr. Ramunno seeks to suggest that development of the immotile sperm point and an attempted inference by the jury that it came from someone else other than the defendant, might have had a bearing on the credibility of . . . [the girl].

THE WITNESS: Yes, I appreciate the argument.

THE COURT: Do you recall having thought about that, or was this just rejected, or did you, can you recall your thought process at all?

THE WITNESS: No, it didn't fit in with my thoughts. The fact this was a thirteen year old girl, and apparently a good reputation, and I didn't see any reason to pursue that with her, and the hymen [was] still intact.

From counsel's entire testimony concerning the matter and the absence of any indication in the record that the matter was discussed with petitioner, I conclude that counsel, during the pre-trial preparation and trial, simply failed to perceive the significance of dead sperm evidence. His attention focused on the absence of physical injury and the dead sperm evidence just escaped analysis. I further conclude that the value of this evidence would not have escaped a competent attorney who had been able to take the time to thoughtfully examine the potential evidence in the case.

I am satisfied that, whether because of the press of other business or otherwise, Mr. Reed gave little thought to this case prior to the commencement of trial. Taken together, the extremely limited contact with the defendant and his witnesses, the failure to make any effort to investigate the prosecutrix, or to speak with any potential state witnesses, the absence of voir dire questions, the failure to make an opening statement, and the brevity of the treatment of the mercy issue, lend support to this conclusion. Convinced that he could not secure a continuance, counsel went forward on the theory that the prosecutrix's story of violence was inconsistent with the absences of bruises or other

10. I say "at best" because the explanation, in addition to being an afterthought, is difficult to follow. First, it was suggested that it would have been unwise to emphasize to the jury the defendant's age and the fact that he had four children. The defendant's age was placed in evidence by the state, however, and elicited again by defense counsel in questioning the defendant. Non-sterility could, of course, have been established by testing. The remainder of the explanation given in the state hearing, but not repeated before this Court, was as follows:

And secondly, on the sperm—that whether a Korean is black or white or in between, I don't know, but you get into that —knowing the sperm is dead, I think it would be better—I mean, if the girl had live sperm, I think it would be worse for the defendant than having the dead sperm, without underscoring all of the possibilities of how the sperm might have died. I think they could have been live when the slide, semen was extracted from the girl and still died.

**506**

significant personal injury. This was, of course, a legitimate and important point to make. It was clearly not the only point, however, which could have been made to support the defendant's version of the facts. Counsel, under the pressures which a lack of preparation had created, simply did not focus on the potential of other ammunition concededly available to him.

By holding as I do that petitioner was denied the effective assistance of counsel guaranteed by the Sixth Amendment, I do not cast any aspersion on Mr. Reed's general competence as an attorney. I find only that his performance in this case, for some reason not revealed in this record, fell below the minimum permissible level of representation. Nor, of course, do I suggest that a failure to request special voir dire questions or a failure to make an opening statement are in themselves badges of deficient representation. They clearly are not. Nor, indeed, does a failure to investigate the character of the prosecutrix in a rape case necessarily suggest a breach of professional duty. A lawyer's performance at any given stage can only be evaluated in the context of his overall performance, the case which he has undertaken to try, and the tools at his disposal. Finally, I do not suggest that during any retrial of this case, the dead sperm evidence must necessarily be tendered by defense counsel. If after such development of the evidence as may now be reasonably practicable, and after consultation with the petitioner, counsel makes a conscious and informed judgment regarding this matter and decides not to offer it, there can be no criticism.

In this case, the petitioner stood to forfeit his freedom for life. He may, as the trial judge suggests, be guilty of the crime charged. But wherever the truth lies, petitioner deserved more in the way of representation than he got. His present confinement is, accordingly, inconsistent with the Sixth Amendment of the United States Constitution.

A writ of habeas corpus will be issued directing petitioner's release from confinement unless the state elects to retry petitioner within a reasonable time to be specified in the order. Accordingly, this Court need not address the other constitutional challenges which petitioner presses.

Submit order.

