HACKIN *v.* ARIZONA ET AL.

No. 523.  Decided November 13, 1967.

PER CURIAM.

The motion to dispense with printing the jurisdictional statement is granted.  The motion to dismiss is granted and the appeal is dismissed for want of a substantial federal question.

MR. JUSTICE DOUGLAS, dissenting.

Appellant, who is not a licensed attorney, appeared in a state court habeas corpus proceeding on behalf of an indigent prisoner.  The indigent prisoner was being held for extradition to Oklahoma, where he had been convicted of murder and had escaped from custody.  Appellant had previously attempted to secure for the prisoner appointed counsel to argue in court the prisoner's contention that his Oklahoma conviction was invalid due to denial of certain constitutional rights.  But in Arizona an indigent has no right to appointed counsel at habeas corpus proceedings [1] (*e. g., Palmer* v. *State,* 99 Ariz. 93,

---

[1] Appellant's conviction for unauthorized practice of law would seem to be the result of Arizona's restrictive reading of *Gideon* v. *Wainwright,* 372 U. S. 335.  In *State* v. *Bost,* 2 Ariz. App. 431, 409 P. 2d 590, the court held *Gideon* inapplicable to extradition proceedings because they were ministerial rather than judicial in nature.  Some members of this Court have expressed doubt whether pigeonholing criminal proceedings into categories such as felony, misdemeanor, habeas corpus, etc., is a proper means for the States to develop the full scope of the *Gideon* rule.  See *DeJoseph* v. *Connecticut,* 385 U. S. 982, and *Winters* v. *Beck,* 385 U. S. 907 (dissenting opinions of MR. JUSTICE STEWART).  Had Arizona courts approached the problem in that light rather than selecting between the labels "ministerial" and "judicial," they might have concluded that indigents in the position of the prisoner whom appellant aided here are entitled to counsel under *Gideon.*

407 P. 2d 64) including habeas corpus proceedings that are part of the extradition process (*Applications of Oppenheimer*, 95 Ariz. 292, 389 P. 2d 696). Unable to obtain counsel for the indigent, appellant chose to represent him himself and was convicted of a misdemeanor for violation of an Arizona statute providing that "No person shall practice law in this state unless he is an active member of the state bar in good standing . . . ." (*Hackin* v. *State*, 102 Ariz. 218, 427 P. 2d 910, quoting Ariz. Rev. Stat. Ann. § 32–261 A.)

Appellant contends that this statute suffers from overbreadth and vagueness and is unconstitutional on its face because it interferes with the rights of the destitute and ignorant—those who cannot acquire the services of counsel—to obtain redress under the law for wrongs done to them. He also alleges the statute is unconstitutional as applied here, where appellant acted on behalf of the indigent prisoner only after exhaustive efforts to obtain appointed counsel. Appellant is no stranger to the law. He graduated from an unaccredited law school but was refused admission to the Arizona Bar. See *Hackin* v. *Lockwood*, 361 F. 2d 499 (C. A. 9th Cir.), cert. denied, 385 U. S. 960.

The claim that the statute deters constitutionally protected activity is not frivolous. Whether a State, under guise of protecting its citizens from legal quacks and charlatans, can make criminals of those who, in good faith and for no personal profit, assist the indigent to assert their constitutional rights is a substantial question this Court should answer.

Rights protected by the First Amendment include advocacy and petition for redress of grievances (*NAACP* v. *Button*, 371 U. S. 415, 429; *Edwards* v. *South Carolina*, 372 U. S. 229, 235), and the Fourteenth Amendment ensures equal justice for the poor in both criminal and civil actions (see *Williams* v. *Shaffer*, 385

U. S. 1037 (dissenting opinion)). But to millions of Americans who are indigent and ignorant—and often members of minority groups—these rights are meaningless. They are helpless to assert their rights under the law without assistance. They suffer discrimination in housing and employment, are victimized by shady consumer sales practices, evicted from their homes at the whim of the landlord, denied welfare payments, and endure domestic strife without hope of the legal remedies of divorce, maintenance, or child custody decrees.[2]

If true equal protection of the laws is to be realized, an indigent must be able to obtain assistance when he suffers a denial of his rights. Today, this goal is only a goal. Outside the area of criminal proceedings covered by our decisions in *Gideon* v. *Wainwright,* 372 U. S.

[2] See *Williams* v. *Shaffer,* 385 U. S. 1037, 1040 (dissenting opinion); *In re Community Legal Services,* Court of Common Pleas of Philadelphia County (No. 4968, March Term, 1966; decided May 10, 1967). See also Pye, The Role of Legal Services in the Antipoverty Program, 31 Law & Contemp. Prob. 211, 216–217 (1966): "The poor man because of his lack of education and social status, may need representation in matters such as a dispute with a high school principal over the dismissal of a child, or the assertion of a complaint for a violation of the health or building code by a landlord under circumstances where the better educated citizen could speak for himself." For broad discussion of the many and varied areas where the poor need assistance, see Symposium on Law of the Poor, 54 Calif. L. Rev. 319 *et seq.* (1966); Dorsen, ed., Poverty, Civil Liberties, and Civil Rights: A Symposium, 41 N. Y. U. L. Rev. 328 (1966); Cahn & Cahn, The War on Poverty: A Civilian Perspective, 73 Yale L. J. 1317 (1964); McCalpin, A Revolution in the Law Practice?, 15 Clev.-Mar. L. Rev. 203 (1966); Carlin & Howard, Legal Representation and Class Justice, 12 U. C. L. A. L. Rev. 381 (1965); Sparer, Thorkelson & Weiss, The Lay Advocate, 43 U. Det. L. J. 493 (1966); Levi, Problems Relating to Real Property, in National Conference on Law and Poverty Proceedings 1 (1965); Dunham, Consumer Credit Problems of the Poor—Legal Assistance as an Aid in Law Reform, *id.,* at 9; Polier, Problems Involving Family and Child, *id.,* at 14.

335, and *Douglas* v. *California,* 372 U. S. 353, counsel is seldom available to the indigent. As this Court has recognized, there is a dearth of lawyers who are willing, voluntarily, to take on unprofitable and unpopular causes. *NAACP* v. *Button,* 371 U. S., at 443. See also *Johnson* v. *Avery,* 252 F. Supp. 783, 784 (D. C. M. D. Tenn.).

Some States, aware of the acute shortage of lawyers to help the indigent, have utilized the abilities of qualified law students to advise indigents and even to represent them in court in limited circumstances.[3] But where this practice is not sanctioned by law, the student advocate for the poor may be subjected to criminal penalty under broadly drafted statutes prohibiting unauthorized practice of law.

There is emerging, particularly in the ghetto areas of our cities, a type of organization styled to bring a new brand of legal assistance to the indigent. These groups, funded in part by the federal Office of Economic Opportunity, characteristically establish neighborhood offices where the poor can come for assistance. They attempt to dispense services on a comprehensive integrated scale, using lawyers, social workers, members of health professions, and other nonlawyer aides.[4] These

---

[3] See, *e. g., Matter of Legal Aid Society of the City of Albany,* 27 App. Div. 2d 687, 277 N. Y. S. 2d 632; *Matter of Cornell Legal Aid Clinic,* 26 App. Div. 2d 790, 273 N. Y. S. 2d 444; Monaghan, Gideon's Army: Student Soldiers, 45 B. U. L. Rev. 445 (1965); Broden, A Role for Law Schools in OEO's Legal Services Program, 41 Notre Dame Law. 898 (1966); Cleary, Law Students in Criminal Law Practice, 16 DePaul L. Rev. 1 (1966); Note, 12 Wayne L. Rev. 519 (1966).

[4] See generally Cahn & Cahn, *supra,* n. 2, at 1334–1352; Carlin & Howard, *supra,* n. 2, at 432–436; Rosenblum, Controlling the Bureaucracy of the Antipoverty Program, 31 Law & Contemp. Prob. 187, 208 (1966); Note, Ethical Problems Raised by the Neighborhood Law Office, 41 Notre Dame Law. 961 (1966); Paulsen, Law

new and flexible approaches to giving legal aid to the poor recognize that the problems of indigents—although of the type for which an attorney has traditionally been consulted—are too immense to be solved solely by members of the bar. The supply of lawyer manpower is not nearly large enough.[5] But the necessary involvement of lay persons in these programs threatens their success. Lay involvement was recently cited by New York's

Schools and the War on Poverty, in National Conference on Law and Poverty Proceedings 77 (1965).

The O. E. O. Guidelines for Legal Services Programs states that the programs are expected to be a component of a community action agency run, in part, by representatives of labor, business, religion, minority groups, and the poor. (P. 5.) Residents of the depressed area served by the legal office are expected to participate directly in the legal services program. (P. 10.) "The poor must be· represented on the board or policy-making committee of the program to provide legal services, just as they are represented on the policy-making body of the community action agency." (P. 11.) "Whenever possible, the board of the legal services program should include at least one representative from each of the areas or neighborhoods with a substantial population to be served." (P. 12.) The staff of the neighborhood legal office may utilize the talents of law schools (p. 24) and "may include a person trained in the field of social work" (p. 29) plus "interviewers, investigators, law students, neighborhood aides, and trained personnel from other disciplines." (P. 31.)

[5] See Cahn & Cahn, What Price Justice: The Civilian Perspective Revisited, 41 Notre Dame Law. 927 (1966). "Finally, with respect to manpower, we have created an artificial shortage by refusing to learn from the medical and other professions and to develop technicians, nonprofessionals and lawyer-aides—manpower roles to carry out such functions as: informal advocate, technician, counsellor, sympathetic listener, investigator, researcher, form writer, etc." (P. 934.) "[T]he possibility of advancing the cause of justice through increasing lay involvement in fact finding, adjudication and arbitration, should not be sacrificed a priori out of fear of abuse." (P. 951.) See also Ginsberg & Shiffman, Manpower and Training Problems in Combating Poverty, 31 Law & Contemp. Prob. 159 (1966).

Appellate Division as one ground for denying the application of a proposed corporate aid-to-indigent program for New York City. *Matter of Action for Legal Services,* 26 App. Div. 2d 354, 274 N. Y. S. 2d 779; contra, *In re Community Legal Services,* Court of Common Pleas of Philadelphia County, No. 4968, March Term, 1966 (decided May 10, 1967).[6]

The so-called "legal" problem of the poor is often an unidentified strand in a complex of social, economic, psychological, and psychiatric problems. Identification of the "legal" problem at times is for the expert. But even a "lay" person can often perform that function and mark the path that leads to the school board, the school principal, the welfare agency, the Veterans Administration, the police review board, or the urban renewal agency.[7] If he neither solicits nor obtains a fee for his

---

[6] Zimroth, Group Legal Services and the Constitution, 76 Yale L. J. 966, 968 (1967), reports that the O. E. O. legal services programs involving lay persons have also survived challenges in Houston, Texas, and Modesto, California.

[7] See Frankel, Experiments in Serving the Indigent, in National Conference on Law and Poverty Proceedings 69, 75–76 (1965): "[W]e lawyers must certainly confront constructively the idea that what we have traditionally regarded as legal business cannot permanently be so regarded. The needs of the poor for services in matters that are somehow legal appear pretty clearly to be enormous. Among those needs are many kinds of matters that are narrow, that are specialized, and can be routinized. Matters related to housing, to workmen's compensation, to consumer problems are a few that one could name. . . . [W]e should attempt to create a class of legal technicians who can handle, under lawyers' supervision, some of the problems that have thus far seemed to us to be exclusively the province of the lawyer. I think we have an important creative function to perform in trying to mark out these areas where lawyers are not really needed."

See Paulsen, The Law Schools and the War on Poverty, in National Conference on Law and Poverty Proceedings 77, 81 (1965): "Services to the poor .will undoubtedly call for advocacy

services, why should he not be free to act? Full-fledged representation in a battle before a court or agency requires professional skills that laymen lack; and therefore the client suffers, perhaps grievously, if he is not represented by a lawyer. But in the intermediate zone where the local pastor, the social worker, or best friend [8] commonly operates, is there not room for accommodation? Dean Charles E. Ares recently said:

> ". . . [T]he *structure* of the legal profession *is* middle class in its assumptions. We assume that the lawyer can sit quietly in his office awaiting the knock on the door by a client who has discovered that he has a legal problem and has found the way to

and advice by lay persons as well as lawyers. A lawyer's time is costly. Not every problem thrown up by legal arrangements requires the skill and costly time of a law-trained person. We can, perhaps, expect the creation of advice centers operated by laymen not unlike Britain's Citizen's Advice Bureaus."

[8] In habeas corpus proceedings, "the practice of a next friend applying for a writ is ancient and fully accepted." *United States* v. *Houston,* 273 F. 915, 916 (C. A. 2d Cir.). It rests on the premise that "[w]ithout some assistance, their right to habeas corpus in many instances becomes empty and meaningless." *Johnson* v. *Avery,* 252 F. Supp. 783, 784 (D. C. M. D. Tenn.). The next-friend doctrine was recognized at common law and is given effect in most jurisdictions today, either by statute or by court decision. See *Collins* v. *Traeger,* 27 F. 2d 842, 843 (C. A. 9th Cir.); *Ex parte Dostal,* 243 F. 664, 668 (D. C. N. D. Ohio); *State* v. *Fabisinski,* 111 Fla. 454, 461, 152 So. 207, 209; *In re Nowack,* 274 Mich. 544, 549, 265 N. W. 459, 461; *In re Nahl* v. *Delmore,* 49 Wash. 2d 318, 301 P. 2d 161; 28 U. S. C. § 2242.

An Arizona statute provides that application for habeas corpus may be made by the person detained "or by some person in his behalf . . . ." Ariz. Rev. Stat. Ann. § 13–2002. The court below recognized that this statute precluded prosecution of appellant for writing and filing the writ application on behalf of the indigent prisoner. *Hackin* v. *State,* 102 Ariz., at 219, 427 P. 2d, at 911. But the statute was held not to authorize appellant to argue the matter in court. *Id.,* at 220, 427 P. 2d, at 912.

the lawyer's office. . . . This assumption is not valid for the great mass of people who live in poverty in the United States. . . . The ways in which this structure can be changed open exciting and interesting prospects." Poverty, Civil Liberties, and Civil Rights: A Symposium, 41 N. Y. U. L. Rev. 328, 346 (1966).

Moreover, what the poor need, as much as our corporate grants, is protection before they get into trouble and confront a crisis. This means "political leadership" for the "minority poor." *Id.*, at 351. Lawyers will play a role in that movement; but so will laymen. The line that marks the area into which the layman may not step except at his peril is not clear. I am by no means sure the line was properly drawn by the court below where no lawyer could be found and this layman apparently served without a fee.

Legal representation connotes a magic it often does not possess—as for example, the commitment procedure in Texas, where, by one report, 66 seconds are given to a case, the lawyer usually not even knowing his client and earning a nice fee for passive participation. Weihofen, Mental Health Services for the Poor, 54 Calif. L. Rev. 920, 938–939 (1966). If justice is the goal, why need a layman be barred here?

Broadly phrased unauthorized-practice-of-law statutes such as that at issue here could make criminal many of the activities regularly done by social workers who assist the poor in obtaining welfare and attempt to help them solve domestic problems.[9] Such statutes would also tend

---

[9] "Social workers in public assistance may already be *required* to practice law as substantially as if they were in a courtroom. In making an initial determination of an applicant's eligibility, the public assistance worker must complete the applicant's financial statement. 'Every question, or nearly every question, on the financial statement, is a legal question. When the social worker advises,

to deter programs in which experienced welfare recipients represent other, less articulate, recipients before local welfare departments.[10]

As this Court's decisions in *NAACP* v. *Button, supra,* and *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1, indicate, state provisions regulating the legal profession will not be permitted to act as obstacles to the rights of persons to petition the courts and other legal agencies for redress. Yet statutes with the broad sweep of the Arizona provision now before this Court would appear to have the potential to "freeze out" the imaginative new attempts to assist indigents realize equal justice, merely because lay persons participate.[11] Cf. *NAACP* v. *Button,* 371 U. S., at 436. As we said in *Button,* the threat of sanctions may deter as forcefully as the imposition of the sanctions. *Id.,* at 433. In such circumstances, "the State may prevail only upon showing a subordinating interest which is compelling." *Bates* v. *Little Rock,* 361 U. S. 516, 524. Certainly the States have a strong interest in preventing legally untrained shysters who pose as attorneys from milking the public

---

or even discusses the questions or answers, he may very likely be giving legal advice.' The private social worker who advises an applicant that he should apply, how to apply, what to answer and how to appeal if the application is rejected is also giving 'legal' advice. When he argues with the public worker on behalf of the applicant, he is giving representation. When and if he goes to a hearing on behalf of the applicant, he is surely engaging in advocacy." Sparer, Thorkelson & Weiss, *supra,* n. 2, at 499–500. See also McRae & Linde, An Emerging Joint Venture: Lawyers and Social Workers, 48 J. Am. Jud. Soc. 231 (1965); Rosenblum, *supra,* n. 4, at 208.

[10] Sparer, Thorkelson & Weiss, *supra,* n. 2, at 507.

[11] Such statutes have also been utilized for attack on attorneys themselves who defend locally unpopular causes, such as civil rights. See Washington Post, Sept. 20, 1967, § A, at 10, col. 1, reporting a Louisiana prosecution of a civil rights lawyer for "unauthorized practice." Cf. *NAACP* v. *Button,* 371 U. S. 415.

152

for pecuniary gain. Cf. *NAACP* v. *Button,* at 441. But it is arguable whether this policy should support a prohibition against charitable efforts of nonlawyers to help the poor. Cf. *Opinion of the Justices to the Senate,* 289 Mass. 607, 615, 194 N. E. 313, 317–318. It may well be that until the goal of free *legal* assistance to the indigent in all areas of the law is achieved, the poor are not harmed by well-meaning, charitable assistance of laymen. On the contrary, for the majority of indigents, who are not so fortunate to be served by neighborhood legal offices, lay assistance may be the only hope for achieving equal justice at this time.

In sum, I find the questions posed in this appeal both timely and troublesome; and it would appear that appellant has standing to raise the indigent's First Amendment rights of advocacy and petition of redress and of equal justice. See *NAACP* v. *Button, supra,* at 428; *Griswold* v. *Connecticut,* 381 U. S. 479, 481. Since the very nature of the inequity suffered by the poor precludes them from asserting their rights to legal assistance in court, why should the layman who steps up to speak for them not be held to be asserting their constitutional rights? *Johnson* v. *Avery, supra,* at 786. Cf. *Barrows* v. *Jackson,* 346 U. S. 249, 257. Accordingly, I would hear this appeal.