Emilio L. IPPOLITO, Susan L. Mokdad, and Daniel E. Schramek, Plaintiffs,

v.

The STATE OF FLORIDA, the Florida Supreme Court, the Florida Bar, et al., Defendants.

No. 92–880–Civ–T–99.

United States District Court, M.D. Florida, Tampa Division.

June 14, 1993.

Emilio L. Ippolito, Susan L. Mokdad and Daniel E. Schramek, pro se.

George L. Waas, Asst. Atty. Gen., Joanne Day, Tallahassee, FL, for defendants.

## ORDER

SCHLESINGER, District Judge.

Plaintiffs are individuals unlicensed to practice law in the State of Florida and non-members of the Florida Bar who desire to practice law in the State of Florida. Plaintiffs bring this suit against the State of Florida, the Florida Supreme Court, the Florida Bar, the President of the Florida Bar, the Florida Bar's Executive Director, members of the Board of Directors, the Second District Court of Appeals and its member judges, various state attorneys and public defenders, the Florida Bar's Committee against the Unlawful Practice of Law, and its committee members. In the Complaint, Plaintiffs state two claims for relief: (1) that the Florida Bar has engaged in a pattern of racketeering activities in violation of the Racketeer Influenced Corrupt Organization Act ("RICO"), including Plaintiffs' selective prosecution for the unauthorized practice of law, and (2) Plaintiff Ippolito's malicious prosecution by Judge Sam D. Pendino.[1] Plaintiffs have filed a Motion to Amend the Complaint to include additional charges of retaliation and reprisal. The statutory basis for these claims is 42 U.S.C. §§ 1983, 1985. Jurisdiction is predicated on 28 U.S.C. § 1331.

In essence, Plaintiffs assert in a lengthy three Count Complaint that the Florida Bar, along with the remaining Defendants, has engaged in a conspiracy to deprive them and others without due process of law of their allegedly constitutionally protected rights to practice law, as well as a multitude of other rights. Plaintiffs are neither licensed to practice law in the State of Florida, nor have they been licensed, but Plaintiffs are associated with several non-profit organizations, such as Pro Se Litigants of America, Inc.,

---

1. Plaintiffs also allege that the Florida Bar deprives non-members without due process of law of an alleged constitutionally guaranteed right to practice law. Plaintiffs do not, however, elaborate on the specifics of this claim.

and the Defenders of Life and Property, Inc., which endeavor—as unlicensed, non-members of the Florida Bar—to represent clients. In response to the allegations in the Complaint, Defendants have filed numerous dispositive motions, including motions to dismiss and motions for summary judgment,[2] to which Plaintiffs have not responded. In response, Plaintiffs have only filed a Motion to Strike Defendants' dispositive motions.

## A.

### STANDARD OF REVIEW

A complaint should not be dismissed for failure to state a cause of action "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *see, e.g., Bank v. Pitt*, 928 F.2d 1108 (11th Cir. 1991). In deciding a motion to dismiss, the Court must consider the four corners of the complaint, *see Kopec v. Coughlin*, 922 F.2d 152, 154–55 (2d Cir.1991), and accept Plaintiffs' allegations as true. All reasonable inferences are to be resolved in Plaintiffs' favor. *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986).

## B.

### PLAINTIFFS' CLAIMS

Plaintiffs contend that the Florida Bar represents a government within a government, and lacks any formal checks and balances. Plaintiffs also allege that the state legislature has delegated to the Florida Supreme Court, a judicial branch of government, quasi-legislative authority in violation of the Constitution of the State of Florida. Further, Plaintiffs allege that the judiciary has encroached on the legislature's traditional function as regulator, and by doing so, has eschewed the constitutional doctrine mandating separation of powers.

Similarly, Plaintiffs assert that the Florida Supreme Court lacks "inherent power" to function as a regulatory body and regulate its members. Because it cannot regulate its own members, *a fortiori*, the Florida Supreme Court and the Florida Bar lack the power to impose a regulatory scheme on non-members. By sanctioning Plaintiffs and prohibiting them from practicing law, Plaintiffs contend that the Florida Bar through its Unfair Practice of Law Committee has deprived non-members without due process of their allegedly constitutional right to practice law.

Related to this claim is Plaintiffs' civil RICO claim. Plaintiffs assert that the Florida Supreme Court has created an "enterprise"—the Florida Bar—which has engaged in a pattern of racketeering activity with judges and attorneys that has deprived Plaintiffs of their cherished constitutional rights.[3] By filing this federal action, Plaintiffs seek a declaration that the Florida Bar is a corrupt organization within the meaning of Title 18, United States Code, Section 1961. By the Court so ruling, Plaintiffs hope to thwart this allegedly unlawful conspiracy.

For the reasons stated below, Plaintiffs are unable to state a cause of action and meet the standard announced in *Conley*. The factual allegations giving rise to each of Plain-

---

2. The Court treats the motions for summary judgment as motions to dismiss since the Court will consider only the allegations in the Complaint and will disregard any affidavits or extrinsic evidence. *Cf. Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F.Supp. 1362 (D.Conn.1987).

3. These deprivations include, inter alia, the following rights:
 1. Access to the Courts
 2. Redress to Court
 3. Jury Trials
 4. Assistance of Counsel of Choice for all litigation
 5. Speedy trial
 6. Impartial/Public trial
 7. Intimidation and excessive force by bailiffs
 8. Harassment
 9. Coercion
 10. Removing documents from Court files
 11. Denying access to public files
 12. Taking private companies without court order.
 13. Conflicts between judges and attorneys
 14. No checks and balances
 15. Self-discipline of attorneys
 16. Failure of judges to investigate wrongdoing

Complaint at 27, ¶ 30.

tiffs' claims demonstrate that Plaintiffs are not entitled to relief.

## C.

### HISTORY OF THE FLORIDA BAR

The controversy surrounding the role of the Bar is not a novel question. Since the time of Edward I (King of England 1272–1307) and continuing for centuries to follow, the legal profession has occupied a unique role in society, in part, by virtue of the important responsibilities entrusted to it. Justice Frankfurter eloquently pronounced the legal profession's responsibilities when writing that. "[o]ne does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to 'life, liberty, and property' are in the professional keeping of lawyers." *Schware v. Board of Bar Examiners,* 353 U.S. 232, 247, 77 S.Ct. 752, 760, 1 L.Ed.2d 796 (1957) (Frankfurter, J., concurring). A lawyer's responsibility is preeminently to stand " 'as a shield' [ ] in defense of right and ward off wrong." *Id.*

. Since the early thirteenth century in England, the House of Lords has determined not only the Bar's membership, but also the qualifications and requirements for admission to the Bar, which in reality is a license to practice law. In the United States, the state supreme courts acting through appropriate committees exercise ultimate control over bar applicants. Entrusted to each state bar is responsibility for determining the educational requirements,[4] and the moral fitness[5] of those who will manage the most important affairs of their clients. Because the legal profession is charged with such matters, "there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as 'moral character.' " *Schware,* 353 U.S. at 247, 77 S.Ct. at 761. This is the Bar's unique responsibility.

The Bar's "inherent power" to regulate those who desire to practice law has been widely recognized by the states.[6] Over the years, many states have instituted integrated

[4] The Rules of the Supreme Court of Florida Relating to Admission to the Bar provides:
**Section 1.** No applicant shall be admitted to the General Bar Examination unless he or she furnishes to the Board:
a. Satisfactory evidence that the applicant has received an academic Bachelor's Degree granted on a basis of a four-year period of study in a college or university on the approval list of any one of the following regional accrediting associations:
(1) New England Association of Schools and Colleges;
(2) Middle States Association of Colleges and Schools/Commission on higher education;
(3) North Central Association of Colleges and Schools—Commission on Colleges;
(4) Southern Association of Colleges and Schools—Commission of Colleges;
(5) Northwest Association of Schools and Colleges;
(6) Western Association of Schools and Colleges—Accrediting Commission for Senior Colleges.
. . . .
Fla. Admission to Bar, Art. III § 1.

[5] The Rules of the Supreme Court of Florida Relating to Admissions to the Bar contains certain standards used in determining an applicant's moral character and fitness to practice law:

**Section 2.a.** No person shall be recommended by the Florida Board of Bar Examiners to the Supreme Court of Florida for admission to the Florida Bar unless such person first produces satisfactory evidence to the Board of good moral character and adequate knowledge of the standards and ideals of the profession and that such person is otherwise fit to take the oath and perform the obligations and responsibilities of an attorney.
b. The primary purposes of character and fitness screening before admission to the Florida Bar are to assure the protection of the public and safeguard the justice system. An attorney should be one whose record of conduct justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them. A record manifesting a deficiency in the honesty, trustworthiness, diligence, or reliability of an applicant may constitute a basis for denial of admission.
. . . .
Fla. Admission to Bar, Art. III § 2.

[6] Even Congress has recognized states' and territories' authority to license attorneys. For example, a requirement for appointment as a magistrate judge is that a candidate must be a member in good standing of the bar of the highest court of a state or territory. *See* 28 U.S.C. § 631.

bars, requiring all attorneys who are *licensed to practice* law within a given state to be a *member* of a cohesive bar association. The Florida Bar was integrated in 1950. In 1949, the proposed integration of the Florida Bar aroused the public's interest, spawning considerable debate over the appropriateness and desirability of integration. An issue then raised was whether the Florida Supreme Court had the "inherent power" to integrate the Bar; and if so, whether integration was in the best interest of the Bar and the public?

The Florida Supreme Court considered these issues and decided that it did have the power to integrate the Bar. At the time this question was presented, twenty-seven states considering integration concluded that a state supreme court had the "inherent power" to integrate a bar. *Petition of Florida State Bar Ass'n,* 40 So.2d 902, 906 (Fla.1949). The Florida Supreme Court described this power as follows:

> It is essential to its being and dignity [which] does not require an express grant to confer it. Under our form of government it is the right that each department of government has to execute the powers falling naturally within its orbit when not expressly placed or limited by the existence of a similar power in one of the other departments."

*Id.* at 905.

In its opinion, the Florida Supreme Court noted that attorneys are not officers of either the state or the county. Rather, they are officers of the court and an integral part of the state judicial system. The practice of law is inextricably connected with the exercise of the judicial power so that "the right to define and regulate the practice naturally and logically belongs to the judicial department of the government." *Id.* at 907.

Also, the Court considered the public policy furthered by integrating the Florida Bar—integration would allow the Bar to undertake many projects that a minority membership could not perform. The Court found

this to be true even though some feared that, by integrating the Bar, the will of the many would be subject to the desires of a select few. The Florida Supreme Court surveyed the history of integration, including its origin in thirteenth century England and rejected the opponents' fears. Integration, the Court stated, was never designed to "sacrifice the freedom and initiative of the [B]ar." *Id.*

Yet the Court recognized that integration would impose curbs on professional freedom. The Court acknowledged the similarities between integration and the fictional adventures of Robinson Crusoe. The Court noted that "Robinson Crusoe enjoyed a much greater degree of freedom than he would enjoy if he lived in Tallahassee at the present, but no one in Tallahassee would exchange the degree of freedom he now has for that enjoyed by Crusoe." *Id.* at 909. Given the complexities and changing social and economic conditions, the Florida Bar should exist first to "order its house and meet such emergencies." *Id.*

The need for a professional bar has never been greater. At one time, the practice of law remained largely unregulated. A century ago, an average educated person could grasp legal concepts and present arguments before a court. In 1845, any person could appear in a Florida state court and litigate a dispute on another's behalf. *In re Amendments to Rules,* 598 So.2d 41 (Fla.1992). At that time, court rules allowed a circuit judge to appoint virtually anyone to be a lawyer. *Id.* (construing Fla.R.Practice (Circuit Courts) 1 & 2 (1845)). Judges, too, lacked formal legal training, as did most attorneys.[7] The law had not fully developed: There were few statutes, and courts relied primarily on the common law. Because legal principles changed much slower than today, courts could decide a case merely by referring to *Blackstone's Commentaries.*

In only a century, the world has changed remarkably and so has the law. Without a

---

7. Florida's first Chief Justice, Thomas Douglas, served as a circuit court judge before completing his legal studies. *In re Amendments,* 598 So.2d at 57 (discussing Joseph A. Boyd, Jr. & Randall Reder, *A History of the Florida Supreme Court,* 35 U.Miami L.Rev. 1019, 1021–22 (1981)).

minimum level of expertise in the practice of law, it is unlikely that an average person could effectively prepare a case for trial, appear in court, and make an effective argument before a judge or a jury. Unskilled laymen attempting to argue their own case, or on behalf of another, would be inordinately disadvantaged. For these reasons, the Bar has become an indispensable component of the modern legal system.

Consider the procedural aspects of preparing a case for trial. A case requires evidence—admissible evidence. The rules of evidence are easily memorized, but applying the rules requires experience and careful planning. Unlike the era when jurists relied almost exclusively on Blackstone,

> [t]oday it is hard to imagine a time when such simplicity existed in legal matters. Unskilled persons who attempt to argue their own cases in a modern courtroom are under the most serious handicap imaginable. Merely mastering the rules of evidence is an overwhelming task that typically takes law students several semesters of study, mock trial practice, and internship. Even then, years of active courtroom practice are needed before a lawyer truly can be considered a master of the evidence code. Yet evidence is only one small aspect of legal practice.

*In re Amendments to Rules,* 598 So.2d 41, 57 (Fla.1992).

An essential part of practicing law is knowledge of the substantive law—the law which creates and defines a party's cause of action. Like the procedural aspects of law, the substantive law has grown significantly over the years. *Id.* The law's proliferation has caused several problems for laymen and attorneys alike. As the law expands, it becomes difficult for attorneys with skilled

staffs to maintain their expertise and to stay abreast of changes in the law. As a result, managing the law's growth requires superior research skills. Today, an attorney must be capable of skillfully researching vast libraries replete with treatises, casebooks, periodicals, bar journals, federal regulations, statutes, and legislative history. Florida caselaw has grown so much over the years that Southern Reporter numbers over six-hundred volumes, and Federal Reporter and Federal Supplement number over 1,500 volumes collectively.

■ These seemingly essential tasks—research and evidence—overwhelm many experienced attorneys. Laymen undertaking representation of another would be handicapped beyond imagination. For these reasons, the State of Florida requires law students to graduate from an accredited three-year graduate program of legal study, pass a detailed background examination, and complete a two day examination testing several areas of substantive law, procedural law, and ethics. These minimum entrance requirements are necessary to provide the public with capable and effective legal representation.[8] For the reasons that follow, the State of Florida sets basic standards for and regulates applicants seeking admission to the legal profession because during the course of representing a client, an attorney may cause a client to relinquish his life, liberty or property.

### D.

### THE NEED FOR PROFESSIONAL REGULATION

The State of Florida regulates virtually all professionals practicing in the State. Among those professions regulated are accountants,[9] doctors,[10] nurses,[11] optometrists,[12] chiroprac-

---

**8.** In a criminal case, reasonably effective legal representation is a constitutional requirement mandated by the Sixth Amendment. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**9.** *Dep't of Professional Regulation v. Rampell,* 589 So.2d 1352 (Fla. 4 Dist.Ct.App.1991).

**10.** *Escobar v. Dep't of Professional Regulation,* 560 So.2d 1355 (Fla. 3 Dist.App.Ct.1990).

**11.** *Northwest Florida Home Health Agency v. Merrill,* 469 So.2d 893 (Fla. 1 Dist.Ct.App.1985).

**12.** *Carter v. Dep't of Professional Regulation,* 613 So.2d 78 (Fla. 1 Dist.Ct.App.1993).

tors,[13] podiatrists,[14] pharmacists,[15] engineers,[16] and insurance agents.[17] Unlike attorneys who are regulated by the Florida Bar, the Department of Professional Regulation ("DOPR"), under the auspices of the legislature, exercises regulatory authority over nonlegal professions. Similar to the Florida Bar, DOPR sets standards for admission to practice, oversees those members admitted to practice, and disciplines members who violate established rules and ethical standards.

The reasons espoused for regulating accountants are similar to those advanced for regulating attorneys. Similar to the legal profession, modern business practices have changed and so has the accounting profession. For some business owners and families, professionals other than accountants can provide reliable and inexpensive bookkeeping, and, to some extent, tax planning. For services beyond that, an accountant or certified public accountant is required. As business has become more complex, many people, even those with modest incomes, require accounting services. Because nonaccountants can provide services at a lower cost, many customers prefer nonaccountants for needed services.

The state's interest in regulating certified public accountants, similar to its interest in regulating attorneys, is "to assure the minimum competence of practitioners and the accuracy of audit statements upon which the public relies...." *Rampell*, 589 So.2d at 1356. By regulating accountants and establishing a minimum level of competence, the legislature protects the public welfare by providing a capable pool of accountants. Through licensing, accountants, in whom the public places its sacred trust, are required to adhere to rigid ethical standards, and when a licensed accountant violates those established standards, the state may impose sanctions. Regulation allows the public welfare to flourish because it requires professionals to remain accountable to the state.

When a professional abuses a client's trust, the consequences can be severe. Experience provides various examples which illustrate the harm caused by professional misconduct. In one instance, an insurance agent sold various health insurance policies to two clients. The agent sold additional policies that were largely duplicative of their existing coverage. The insureds did not suffer any appreciable loss, but the agent did not provide information forthright so the insureds could make a well-informed decision. *Dyer*, 585 So.2d at 1009. Insurance, as a whole, tends to be complex, and an insured requires complete and reliable information before purchasing health insurance. This decision—to purchase affordable health insurance that adequately protects an insured—has significant impact on an insured's life.

In another case involving professional misconduct, a doctor performed a face-lift on a female patient which resulted in injury to the patient. After the initial surgery, the doctor performed additional surgery to correct the earlier damage. The Board of Medicine revoked his license because the doctor was adamant and refused to recognize his professional shortcomings. His failure to remedy his shortcomings adversely affected his competence and capabilities as a doctor. In addition, because he showed little interest in retraining or reeducation, the Board revoked this impervious doctor's license rather than subject the public to further harm. *Escobar*, 560 So.2d at 1355.

In general, professional regulations place restraints on individual liberty and freedom. So, too, regulating professionals places restraints on practitioners and the public whom they serve. The requirement that all plumbers, doctors, and lawyers (as well as other professionals) be trained and licensed is a restraint on individual freedom, but it is a

**13.** *Krakow v. Dep't of Professional Regulation,* 586 So.2d 1271 (Fla. 1 Dist.Ct.App.1991).

**14.** *Rush v. Dep't of Professional Regulation,* 448 So.2d 26 (Fla. 1 Dist.Ct.App.1984).

**15.** *Schiffman v. Dep't of Professional Regulation,* 581 So.2d 1375 (Fla. 1 Dist.Ct.App.1991).

**16.** *Titzel v. Dep't of Professional Regulation,* 599 So.2d 279 (Fla. 1 Dist.Ct.App.1992).

**17.** *Dyer v. Dep't of Ins. & Treasurer,* 585 So.2d 1009 (Fla. 1 Dist.Ct.App.1991).

necessary restraint to ensure a minimum level of competence.

So, when an unlicensed plumber installs pipe without proper training, a customer's home suffers water damage. When a doctor performs a face-lift without the proper training, a patient's body receives injury, and when an attorney mishandles a case and loses, a client forfeits his precious right to either life, liberty, or property because each case before any court involves the issue of either life, liberty, or property. Without the State of Florida setting basic standards for admission, professionals—by their misconduct—would cause irreparable harm to clients and third parties.

Although such misconduct is rare among licensed professionals, when it occurs it endangers a citizen's most important affairs, dreams, and desires. These mishaps would occur more frequently if the state allowed unlicensed professionals to practice. As long as citizens entrust their most important affairs to professionals, states such as Florida will utilize—and should utilize—the police powers to set admission standards and regulate professionals.

### E.

### AN INDEPENDENT JUDICIARY—SEPARATION OF POWERS

Although the legal profession requires professional regulation similar to other professionals, including accountants, doctors, and nurses, the legal profession is self-regulating and outside the purview of the legislature. The reason for this disparate treatment is three-fold. First, the Bar has historically determined its membership and qualifications and requirements for admission since the early thirteenth century. Second, the legal profession is charged with matters that re-

sult in the potential loss of life, liberty, and property. Lastly, the doctrine of separation of powers mandates that in order for the system of checks and balances to be effective, each co-equal branch of government—executive, legislative, and judicial—must remain independent. Implicit in the separation of powers doctrine established by the Constitution of the United States is the notion that a truly independent and separate judiciary must be able to prescribe rules and govern the conduct of its members and nonmembers who practice law.[18]

Of concern to the legal profession are matters that may result in loss of life, liberty, or property. When a 15–year–old girl is murdered by a parolee five months after he is released from prison despite a history as a sex offender,[19] when a driver is severely injured when her vehicle is struck by a fleeing suspect being pursued by a police officer,[20] when a citizen's liberty is jeopardized by an unlawful prosecution,[21] and when a landowner is deprived of all economically viable use of her property without just compensation,[22] the victims seek legal counsel—competent, skilled attorneys—to remedy the alleged injustice and obtain remuneration for their injuries. In each instance, the legal profession is called upon to assist in the resolution of these matters.

The other rationale for the legal profession regulating its own members is the doctrine of "separation of powers." Although the judicial power of the United States extends to "Cases" and "Controversies," the Supreme Court has never held that the Constitution prohibits "Congress from assigning to courts or auxiliary bodies within the Judicial Branch administrative or rulemaking duties that, in the words of Chief Justice Marshall, are 'necessary and proper . . . for carrying into execution the judgments which the judicial de-

18. The Constitution of the State of Florida mandates that "no person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." Fla. Const. art. II § 3.

19. *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), *cert. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980).

20. *Temkin v. Frederick County Commr's,* 945 F.2d 716 (4th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1172, 117 L.Ed.2d 417 (1992).

21. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

22. *Lucas v. South Carolina Coastal Council,* — U.S. —, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

partment has the power to pronounce.'" *Mistretta v. United States*, 488 U.S. 361, 388, 109 S.Ct. 647, 663, 102 L.Ed.2d 714 (1989). The Supreme Court has approved of extrajudicial activities closely related to the judiciary's central mission which are within the providence of the Judicial Branch.

Thus, the Judicial Branch performs various functions closely related to its central mission. To perform these functions, the federal courts have created several organizations, which perform varied but vital roles, such as the Judicial Conference of the United States, the Rules Advisory Committees, the Administrative Office of the United States Courts, the Sentencing Commission, and the Federal Judicial Center. Each entity contributes to the administration of the United States Courts.

The Judicial Conference of the United States has responsibility for ensuring uniformity of management procedures and the expeditious conduct of court business. This includes the continuous study and revision of the rules of practice and procedure. *See* 28 U.S.C. §§ 2071–2077. The Administrative Office of the United States Courts handles administrative and personnel matters. *See* 28 U.S.C. §§ 601–612. The Federal Judicial Center, established by Congress, conducts studies on improvements in judicial administration. *See* 28 U.S.C. §§ 620–629. Moreover, the Sentencing Commission establishes policies and practices for the Federal criminal justice system. *See* 28 U.S.C. §§ 991–998.

The judiciary also performs a variety of other functions not directly related to adversarial proceedings, such as supervising grand juries, participating in the issuance of search warrants, reviewing wiretap applications, initiating contempt proceedings, and investigating alleged improper conduct by a federal judge. These are integral functions of the Judicial Branch.

The Constitution of the State of Florida specifically assigns jurisdiction to the Supreme Court: "The Supreme Court shall have exclusive jurisdiction to regulate the admission of persons to the practice of law and the discipline of persons admitted." Fla. Const. art. V § 15. The Florida Supreme Court through three entities oversees the legal profession. The Florida Board of Bar Examiners implements standards and supervises the admission of people admitted to practice law. The Florida Bar enforces the rules regulating ethical conduct, and the Judicial Qualifications Commission investigates complaints regarding judges. Although these entities assist the Supreme Court in administering the courts, it is the Supreme Court that makes all decisions, including the imposition of discipline.

The fundamental principle underlying the doctrine of separation of powers which has been the landmark for resolving disputes between co-equal branches is as follows: "The actual art of governing under the Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even single Articles torn from context. While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). The application of this principle illustrates, and explains the need for the judiciary's self-regulation [23]—unlike all other professions and professional trade associations, "the bar is a public service organization." John F. Harkness, *Judicial Independence Is At The Heart Of Today's Lawyer Regulation*, Fla.B.J., May 1993, at 12.

Also, the courts are the forum for resolving conflicts. In this forum, attorneys serve as advocates of the citizens. In many instances an attorney opposes adversaries who are agents of other co-equal branches. Thus, an independent judiciary is essential to protect individual citizens from abuse of power by governmental actors. In this respect alone, the practice of law is quite different

**23.** The term "self-regulation" is disagreed with by at least one commentator. John F. Harkness, Executive Director of the Florida Bar, argues that self-regulation is regulation by lawyers with the assistance of the court. Instead, he prefers the term "judicial regulation" which means regulation by the court with the assistance of lawyers. J. Harkness, *infra*.

from other professions. Also unlike accountants and other professionals, an attorney is an officer of the court, having duties that extend beyond loyalty to the client.[24] As such, attorneys have a responsibility to the court and the public which includes providing affordable services and protecting the rights of all citizens in a rapidly changing society. Attorneys also have a responsibility to be ethical in their affairs, to refine the procedural and substantive law, and to update their skills through continuing education.

The reason for judicial regulation, therefore, is to preserve the judiciary's integrity, independence, and autonomy. If the legislature were to regulate the practice of law, ethical issues would become political issues. No longer would the Judicial Branch be immune from "political attacks and the tyranny of the majority." *Id.* at 80. Moreover, the judiciary would lose its stature as an independent co-equal branch of government. It is not implausible to conclude that the legal profession would become less of a profession and more of a business association which would serve only the self-interest of lawyers while ignoring the public interest.[25]

## F.

### SECTION 1983

Plaintiffs challenge the Supreme Court of Florida's exercise of quasi-legislative authority in violation of the Constitution of the State of Florida. Further, Plaintiffs allege that the judiciary has encroached on the legislature's traditional function as regulator, and by doing so, has violated the constitutional doctrine mandating separation of powers.

Plaintiffs also allege that the Florida Bar has conspired with attorneys and judges to deprive citizens, like Plaintiffs, of their cherished constitutional rights. Specifically, Plaintiffs allege that the Florida Bar is a corrupt enterprise that has engaged in a pattern of racketeering activity, depriving citizens without due process of the right to practice law. Plaintiffs claim that the Florida Supreme Court, through the Florida Bar, operates as a twentieth century Star Chamber which deprives them and others of the right to practice law because it imposes an unlawful licensing scheme on non-members practicing law in the State of Florida.

■ As an initial matter, it is important to note that a state court is not a "person" within the meaning of 42 U.S.C. § 1983. *Moity v. Louisiana State Bar Ass'n*, 414 F.Supp. 180 (E.D.La.1976), *aff'd*, 537 F.2d 1141 (5th Cir.1976). Thus, Plaintiffs cannot state a § 1983 claim against the Florida Supreme Court.

■ Also, the Florida State Bar and members acting as agents of the Supreme Court are entitled to absolute immunity in a § 1983 action. *Carroll v. Gross*, 984 F.2d 392 (11th Cir.1993). Therefore, Plaintiffs cannot state a § 1983 claim against the Florida Bar, the Florida Bar's Committee Against The Unlawful Practice of Law, the Bar's president, directors, and committee members. The remaining parties are judges, attorneys, and the Clerk of the Circuit Court for Hillsborough County.

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory, subjects, or

---

**24.** In *Edenfield v. Fane*, ―― U.S. ――, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), the Supreme Court noted the differences that exist between the legal profession and the accounting profession. The Court stated that in the context of solicitation, "a CPA is not 'a professional trained in the art of persuasion.' A CPA's training emphasizes independence and objectivity, not advocacy." *Id.* at ――, 113 S.Ct. at 1802–03.

**25.** One commentator has described judicial decisionmaking in the former Soviet Union where the doctrine of separation of powers did not flourish. The commentator stated that the Communist Party had too much control of the judicial

process. This political control of the judicial system led to confused legislation, unpublished statutes, and unrepealed obsolete statutes. *See Zschernig v. Miller*, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), *reh'g denied*, 390 U.S. 974, 88 S.Ct. 1018, 19 L.Ed.2d 1196 (1968). The commentator noted further that "a leading soviet jurist's construction of article 8 of the law enacting the R.S.F.S.R. Civil Code seemed modeled after Humpty Dumpty, who said, 'When I use a word ..., it means just what I choose it to mean—neither more nor less.'" *Id.* at 435, 88 S.Ct. at 668. (construing Note, 55 Calif.L.Rev. 592, 594–95, n. 10 (1967)).

causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Accordingly, in any § 1983 action the initial inquiry must be to determine if two necessary elements are present: (1) whether the conduct complained of was committed by a person acting under color of state law;[26] and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. Clearly, the first element is established since the Florida Bar is a state organization of considerable authority.

 The inquiry then focuses on the second element: the existence of a right, privilege, or immunity. Plaintiffs allege that Defendants deprived them of their constitutionally protected right to practice law without due process of law in violation of the Fourteenth Amendment. "There is no vested right in an individual to practice law." *In re Isserman*, 345 U.S. 286, 288, 73 S.Ct. 676, 677, 97 L.Ed. 1013 (1953); *see also Schware*, 353 U.S. at 239 n. 5, 77 S.Ct. at 756 n. 5. (stating that it is doubtful that the practice of law can be called a "right"). As the Supreme Court noted, if there is a right, it is the Court's right "to protect itself, and hence society, as an instrument of justice." *Id.* The right to practice law, however, is not a privilege or immunity within the meaning of the Fourteenth Amendment. *State ex rel. Florida Bar v. Sperry*, 140 So.2d 587, 589 (Fla.1962), *vacated on other grounds*, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963); *see also Florida Bar re Advisory Opinion—Non Lawyer Preparation*, 544 So.2d 1013 (Fla.1989).

The Fourteenth Amendment's procedural protections are invoked when a liberty interest or property interest is deprived. If Plaintiffs have been deprived of a such an interest, it would have to be an interest created by state law. In this case, there has been neither a deprivation of a property interest nor a liberty interest. *Cf. Schware*, 353 U.S. at 239, 77 S.Ct. at 756 (holding that a state cannot exclude a person from the practice of law or any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment).

 Plaintiffs have not applied for admission to the Florida Bar.[27] Nor have they been expelled from membership in the Bar. They have undertaken to practice law without being licensed; and as a result, the Florida Bar has adhered to its constitutional mandate and sanctioned Plaintiffs for the unauthorized practice of law. The Florida Bar has the jurisdiction and power—by its inherent supervisory authority and its constitutional grant of jurisdiction—to develop membership standards for its members, and an individual cannot be prevented from pursuing the practice of law except for valid constitutional reasons. This regulatory authority applies to those individuals applying for admission as well as to those attorneys already admitted to practice. *Lathrop v. Donohue*, 367 U.S. 820, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961), *reh'g denied*, 368 U.S. 871, 82 S.Ct. 23, 7 L.Ed.2d 72 (1961). Moreover, the Florida Supreme Court has routinely upheld a court's legitimate authority to punish those who illegally practice law through contempt proceedings or by an injunction. *Sperry*, 140 So.2d at 589; *see also Sperry v. Florida*, 373 U.S. 379, 383, 83 S.Ct. 1322, 1325, 10 L.Ed.2d 428 (1963) (stating that the Court does not "doubt that Florida has a substantial interest in regulating the practice of law within the

---

26. A public defender does not act "under color of state law" when performing a lawyer's traditional function as counsel. *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). *Compare Tower v. Glover*, 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984) (holding that a public defender is not immune from liability under § 1983 for intentional conduct which deprives the client of federal rights).

27. Defendant Florida Bar raises, inter alia, Plaintiffs' standing to bring this action since they are non-members of the Florida Bar. Any such claims brought on behalf of third parties is clearly barred. *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984).

State and that, in the absence of federal legislation, it could validly prohibit nonlawyers from engaging in this circumscribed form of patent practice").

■ On the facts presented in this case, there is no constitutional violation actionable under § 1983 upon which this Court can provide either monetary damages or injunctive relief abolishing the Florida Bar. It would be a different case if the State of Florida had acted arbitrarily and capriciously when denying Plaintiffs' application for admission to the Bar. *See Cummings v. State of Missouri,* 71 U.S. 277, 18 L.Ed. 356 (1867). Thus, Plaintiffs have failed to state a § 1983 claim against the named judges, and attorneys.[28]

■ In addition, Plaintiffs' allegations that the Florida Constitution unconstitutionally vests exclusive jurisdiction in the Supreme Court to regulate the admission of individuals to practice law are similarly without merit. The Florida State Constitution as revised in 1968 and subsequently adopted in 1972 specifically grants to the Supreme Court of Florida exclusive jurisdiction to regulate admission and impose discipline for violating the Bar's rules. *See* Fla. Const. art. V § 15. This vested authority to regulate Bar members is not a legislative delegation of authority, but a constitutional assignment of power. Even taking Plaintiff's allegations as true—which the Court must—Plaintiffs' asserted unconstitutional delegation of power does not violate any federal constitutional rights, privileges, or immunities.[29] If this assignment of power offends any constitutional provisions, it is not those contained in the United States Constitution, but the Florida State Constitution.[30] The Supreme Court of Florida is the final arbiter of state law matters regarding the Constitution of the State Florida, and this Court lacks jurisdiction to review that court's interpretation of its constitution vis-a-vis section 1983. If Plaintiffs' contentions have any merit, they are wholly state matters to be resolved by a Florida court. *See South Dakota v. Neville,* 459 U.S. 553, 568 n. 2, 103 S.Ct. 916, 925 n. 2, 74 L.Ed.2d 748 (1983); *Mental Hygiene Dept. v. Kirchner,* 380 U.S. 194, 198, 85 S.Ct. 871, 874, 13 L.Ed.2d 753 (1965); *Reynolds v. Georgia,* 640 F.2d 702, 705 (5th Cir.1981), *cert. denied,* 454 U.S. 865, 102 S.Ct. 326, 70 L.Ed.2d 165 (1981); *cf. United States. ex rel. Dessus v. Pennsylvania,* 452 F.2d 557, 560 (3d Cir.1971), *cert. denied,* 409 U.S. 853, 93 S.Ct. 184, 34 L.Ed.2d 96 (1972).

### G.

### RICO CLAIMS

■ In Counts One and Two, Plaintiffs allege that all Defendants have engaged in a pattern of racketeering by interfering with Plaintiffs' practice of law. Plaintiffs further allege, as predicate acts, being criminally prosecuted for engaging in the unauthorized practice of law. These claims fail, however, to state a civil RICO cause of action.

**28.** Judges have absolute immunity against monetary damages. *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). *Compare Pulliam v. Allen,* 466 U.S. 522, 104 S.Ct. 1970, 80 L.Ed.2d 565 (1984) (judges may be liable for injunctive relief). Prosecutors are absolutely immune from monetary damages under § 1983. *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1983).

**29.** The Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." In the *Slaughter-House Cases,* 83 U.S. 36, 21 L.Ed. 394 (1873), the Supreme Court defined the parameters of the privileges and immunities clause, which includes the right to assert claims against the government, to transact business with the government, to seek its protection. It also includes the right to peaceably assemble and petition for redress of grievances, the writ of habeas corpus, the use of navigable waters of the United States, all rights secured by treaties with foreign nations, the rights secured by the Thirteenth and Fifteenth Amendments, and the other clause of the Fourteenth Amendment.

**30.** A federal court does not have original jurisdiction over a dispute involving state law matters unless the claim for relief requires resolution of a "substantial, disputed question of federal law" which is a necessary element of one of the well-pleaded state law claims. *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). Plaintiffs have attempted to vitiate federal jurisdiction by artfully pleading this state law matter as violating federal RICO (18 U.S.C. § 1961) and civil rights laws (42 U.S.C. § 1983).

Essentially, a civil RICO claim requires (1) an enterprise, (2) which has engaged in or had some effect on interstate commerce, (3) from which each defendant derived income, directly or indirectly, through a "pattern of racketeering activity," and (4) that some part of that income was used in acquiring an interest in or operating the enterprise. *McCool v. Strata Oil Co.*, 972 F.2d 1452 (7th Cir.1992); *Costantino v. TRW, Inc.*, 773 F.Supp. 34 (N.D.Ohio 1991). The predicate acts alleged by Plaintiffs are not unlawful acts. The Florida Bar, as an enterprise regulating attorneys, may lawfully prohibit Plaintiffs from engaging in the unauthorized practice of law. Moreover, the initiation of a law suit cannot constitute a predicate act, even if that law suit is malicious. *Capasso v. Cigna Ins. Co.*, 765 F.Supp. 839, 843 n. 2 (S.D.N.Y.1991); *see also Von Bulow v. Von Bulow*, 657 F.Supp. 1134 (S.D.N.Y. 1987). *Cf. Park South Assoc. v. Fischbein*, 626 F.Supp. 1108 (S.D.N.Y.1986), *aff'd*, 800 F.2d 1128 (2d Cir.1986).

### H.

### MALICIOUS PROSECUTION

In Count Three, Plaintiff Ippolito claims that Defendant Judge Sam D. Pendino violated RICO by maliciously prosecuting him for exercising his constitutional rights. Malicious prosecution cannot, however, constitute a predicate act for RICO. To the extent that Plaintiff's claim is characterized as a § 1983 action, Plaintiff's claim fails to state a cause of action upon which relief may be granted. *See Strength v. Hubert*, 660 F.Supp. 878, 883 (M.D.Ala.1987), *aff'd in part and rev'd in part on other grounds*, 854 F.2d 421 (11th Cir.1988).

### I.

### LEGAL SERVICES—THE DILEMMA

Although this Court cannot provide the relief requested by Plaintiffs, the Court is sensitive to the rationale underlying those claims. Too often, the rights of minorities—the First Amendment right to advocacy and petition for redress of grievances, and the Fourteenth Amendment's requirement of equal justice—are rendered meaningless because they "are helpless to assert their rights [ ] without assistance." *Hackin v. Arizona*, 389 U.S. 143, 145, 88 S.Ct. 325, 326, 19 L.Ed.2d 347 (1967) (Douglas, J., dissenting). As Justice Douglas noted, "[o]utside the area of criminal proceedings ... counsel is seldom available to the indigent." *Id.* Even though there is an abundance of lawyers, many citizens are unable to retain legal counsel.

The tension between restricting access to the courts and making legal services available to those in need creates a difficult dilemma. Advocates favoring the use of nonlawyers argue that lay involvement is necessary to fill the shortage. *See* Ginsberg & Shiffman, *Manpower and Training Problems in Combating Poverty*, 31 Law & Contemp. Prob. 159 (1966).

Those who advocate lay assistance argue that there is room to accommodate nonlawyers by creating an "intermediate zone" where laymen such as pastors, social workers, or best friends can provide needed assistance. These advocates fear that broad sweeping legislation will impede access to the courts as well as hinder "imaginative new attempts to assist indigents and to realize equal justice." *Id.* at 331; *cf. Brotherhood of Railroad Trainmen v. Virginia*, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964). Through charitable lay assistance, advocates urge that indigents may finally achieve equal justice. Moreover, advocates assert that a state may not constitutionally prohibit charitable efforts by nonlawyers to help the poor because it is the inequitable application of the law that precludes them from asserting their rights.

Access to the courts is a valid concern by judges, lawyers and laymen alike. *See In re Amendment to Rules*, 598 So.2d 41 (Fla.1991). Although increased access to the courts is an important issue, this concern is not a federal constitutional issue, but is a matter properly reserved to the states. *Hackin v. Arizona*, 389 U.S. 143, 88 S.Ct. 325, 19 L.Ed.2d 347 (1967).

Accordingly, it is **ORDERED AND ADJUDGED** that:

**1576**

1. Plaintiffs' Motion to Disqualify Trial Judge (Doc.No. 37, filed on August 5, 1992) is **DENIED.**

2. Plaintiffs' Motion to Strike Defendants' Motions to Dismiss (Doc.No. 38, filed on August 5, 1992) is **DENIED.**

3. Plaintiffs' Motion for Oral Argument on all Motions and Demand to Expedite (Doc.No. 56, filed on September 24, 1992) is **DENIED.**

4. Plaintiffs' Motion for Summary Judgment (Doc.No. 39) is **DENIED.**

5. Defendant Florida Bar's Motion for Summary Judgment (Doc.No. 32, filed on July 16, 1992), Defendant Clerk of the Circuit Court of Hillsborough County's Motion For Summary Judgment (Doc. 49, filed on September 10, 1992), both of which the Court treats as a Motion to Dismiss, and the remaining Defendants' Motions to Dismiss are **GRANTED.** With the exception of Plaintiff Susan Mokdad's claim of an allegedly unlawful seizure of her person by specific individually named defendant(s), Plaintiffs' claims against Defendants are **DISMISSED WITH PREJUDICE.** Plaintiff Mokdad may file a new and separate case alleging this claim because of the difference in the named Plaintiffs and Defendants.

6. The clerk is directed to enter judgment in favor of Defendants and against Plaintiffs as to all claims except Ms. Mokdad's unlawful seizure claim.

7. Plaintiffs' Motion for Enlargement of Time to Amend the Complaint (Doc. No. 70, filed on March 15, 1993) is **DENIED.**

8. The clerk is directed to close this case.

**DONE AND ORDERED.**